Gene Olwyn MEYER, Petitioner-Appellant,

v.

W. J. ESTELLE, Jr., Director, Texas Department of Corrections, Respondent-Appellee.

No. 79–3100

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

July 16, 1980.

---

18. *Griffin v. Aluminum Co. of America, supra,* 564 F.2d at 1173 n.3.

* Fed.R.App.P. 34(a); 5th Cir. R. 18.

Gene Olwyn Meyer, pro se.

P. E. George, Austin, Tex., for respondent-appellee.

Before BROWN, TJOFLAT and FRANK M. JOHNSON, Jr., Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Meyer appeals the denial of his 28 U.S.C.A. § 2254 petition for habeas relief. Following a prosecution resulting in a hung jury, Meyer was retried and convicted by a Texas State Court of the May 6, 1966 robbery by assault of a Shell Oil Company service station. Enhanced by two prior felony convictions, he received a life sentence as an habitual offender. His conviction was affirmed on appeal. *Meyer v. State*, 416 S.W.2d 415 (Tex.Cr.App. 1967). He exhausted his state remedies and filed the instant action. After an evidentiary hearing at which he appeared *pro se*, the magistrate recommended that Meyer be denied relief and the District Judge agreed. On this appeal, Meyer reasserts five grounds for relief: (i) he was charged by a defective indictment; (ii) the fruit of an illegal search was admitted at trial; (iii) speculative evidence lacking a proper foundation was admitted against him at trial; (iv) the prose-

cutor made improper remarks; and, (v) the pre-trial identification procedure used was fatally defective. We find Meyer's grounds lacking and affirm.

We do not dally over issues (i) and (ii). The state indictment incorrectly listed the night manager of the service station rather than Shell Oil Company as the owner of the money stolen. That mistake was not "so fatally defective as to deprive the convicting court of jurisdiction," and is therefore not a basis for federal habeas relief. *Murphy v. Beto*, 416 F.2d 98, 100 (5th Cir. 1969).

Second, a marine battery found in Meyer's automobile was admitted at trial. The battery and a rifle were items taken in a burglary prior to the service station robbery. The rifle was used in the service station robbery and afterwards was sold by an associate of Meyer. The battery was admitted in order to connect Meyer with the rifle. However, Meyer's claim that the battery was the fruit of an illegal search of his automobile was not made at the time of its admission in the state trial court. Texas requires that a defendant make a contemporaneous objection in order to preserve a question for review. *E. g., Aldrighetti v. State*, 507 S.W.2d 770 (Tex.Cr.App. 1974). Meyer has not shown any cause for failure to object although there might be some actual prejudice resulting from admission of the evidence. Under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and *Jiminez v. Estelle*, 557 F.2d 506 (5th Cir. 1977), the unexcused failure to comply with the Texas contemporaneous objection rule forecloses habeas relief on this claim.

Meyer's next two claims ((iii) and (iv)) involve evidence admitted against him and allegedly improper remarks made by the prosecutor at trial. We have repeatedly held that our constitutional review of the conduct of a state trial is limited to ascertaining that it was not fundamentally unfair. The trial may pass constitutional muster even though we would not approve such conduct on direct appeal of a federal trial. "[W]e do not sit as a 'super' state supreme court." *Martin v. Wainwright*, 428 F.2d 356, 357 (5th Cir. 1970); *Alvarez v. Estelle*, 531 F.2d 1319, 1322 (5th Cir. 1976), *cert. denied*, 429 U.S. 1044, 97 S.Ct. 748, 50 L.Ed.2d 757 (1977); *Cronon v. State of Alabama*, 587 F.2d 246, 250 (5th Cir. 1979).

We have no qualms about Meyer's claim that photographs of tire and foot prints from the scene of the robbery should not have been admitted. Whether those prints were connected with Meyer was vigorously argued at trial and decided adversely to Meyer by the jury. In particular, the tire tracks were of an unusual configuration matching that of the tires on Meyer's automobile. We perceive no error in admitting the evidence, much less error of constitutional apogee.

Our evaluation of the prosecutor's allegedly improper remarks requires a brief review of the facts of the robbery. The service station was robbed during the early morning by a robber "disguised" by large dark glasses. Only the night manager was on duty and there were no customers at the time. A getaway vehicle was parked nearby but sufficiently far away so that it could not be easily identified. The robber attempted to jerk the pay phone from the wall in order to prevent the attendant from calling the police after the robbery. A 30.-30 rifle was used.

Meyer first complains of six instances during the final closing argument in which the prosecutor described the robbery as a professional one and Meyer as the professional who engineered it.[1] Both on direct

---

1. What is the significance of Mr. Rader's testimony? The significance shows that this Defendant, to me—this is argument—is a professional.

＊ ＊ ＊ ＊ ＊ ＊

He is not like a high school boy that suddenly has to have some money and drives up in front of a service station and jumps out of the car and runs in and pulls a gun and holds up somebody, and takes the money and flees—the first offender—but this one shows marks of planning. Why does it show marks of planning? Because the person that robbed Mr. McCray did not pull up in the driveway in a car

appeal and here, Meyer argues that the prosecutor was impermissibly making reference to his prior criminal convictions. Read with blinders, two of the seven remarks do suggest that the prosecutor was attempting to inform the jury of Meyer's criminal record: "This is not a case where *a first offender* drives up to a service station, jumps out of the car and runs in with a gun and takes all of the money;" and "He is not like a high school boy that suddenly has to have some money and drives up in front of a service station . . . and takes the money and flees—*the first offender*—but this one shows marks of planning." (Emphasis supplied). But in each of these two instances the prosecutor tied his remarks to the *modus operandi* of the robber. Moreover, the other four "professional" references were similarly tied to the facts of the robbery, and the first was specifically prefaced with the statement "—this is argument—."

We agree with the Texas Court of Criminal Appeals that the prosecutor's remarks taken as a whole were more likely inter-preted by the jury as permissible logical inferences from the facts of the robbery. *Meyer v. State, supra,* 416 S.W.2d at 416. The theme was that from the manner in which the robbery was carried out it had the earmarks of one planned by one experienced in such activities. If this rubbed off to suggest that one who does the task professionally is a professional it was a fair inference, not one seeking to condemn the defendant because he may have been a professional crook. The Trial Judge also twice cautioned the jury that the prosecutor's "professional" remarks were not to be treated as evidence. The remarks were at most a very indirect reference to Meyer's criminal record and are totally different from the direct, unveiled, and unambiguous remarks in *Nero v. Blackburn,* 597 F.2d 991, 994 (5th Cir. 1979). Consequently, we find that the prosecutor's "professional" remarks did not render the trial fundamentally unfair.

The second type of allegedly improper remark occurred also during the prosecu-

---

with a license number on it and which he could give the police the number of the license and the description of the car. Absolutely not. In this case, the man that robbed Mr. McCray parks away from the station, doesn't park on the highway where he can be observed by a passerby or a patrol car, but parks in the bushes. Now, you don't think for minute that whatever person did that, planning that type of robbery, a professional type of robbery, for a minute came out there at 5:30 and executed those plans for the first time, do you? Of course not. In the parlance of a gangster, he "cased the joint." He knew what he was doing. He planned it; he had looked at the scene, he had made his plans, and that's obviously what was happening about midnight. Why would he be out there at midnight—to see how may employees were working at the Shell Station. If there are a bunch of employees, that's not the station he is going to rob—to see how many people are on duty at night. And so at 12:00 or 1:00 o'clock he drives out there to the Shell Station, and there is one person working there. He looks for a road where he can hide the car, and when he leaves he goes back by the Shell Station. He cases the joint; he plans it; he deliberately looks at the situation—a professional type of engineered robbery.

\* \* \* \* \* \*

You had a professional type of robbery, where a person knew exactly what he was doing, who cased the joint, who went out there and found a service station where the owner had only one man, who found a place to put his automobile while he was making the robbery, and who robbed Mr. McCray when there was nobody else there, and Mr. Rader's testimony substantiates that, rather than detracts from it, because that's the way a professional robber would work.

\* \* \* \* \* \*

This is a clear case of planned, premeditated, professional robbery.

\* \* \* \* \* \*

You have an excellent Police Department, and they have done an outstanding job in finding for you a professional robber.

\* \* \* \* \* \*

This is not a case where a first offender drives up to a service station, jumps out of the car and runs in with a gun and takes all the money. He is a man that has on dark glasses; parks the car a hundred yards away from the service station; who picks out his service station where there is but one employee; picks out a time of day when there is nobody else around, and who, I believe, from Mr. Rader's testimony, had looked at the scene the night before, at midnight before, had cased the joint, prepared it and planned it. I think the facts indicate that, and I know that you believe them.

tor's final closing argument. Meyer contends that the prosecutor prejudiced his constitutional privilege against compulsory self-incrimination by commenting on Meyer's failure to testify, contrary to *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). We must take "special care to assure that prosecutorial conduct in no way impermissibly infringes . . ." on Meyer's privilege against self-incrimination. *Donnely v. De Christoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431, 437 (1973).

The alleged *Griffin* remark occurred towards the end of the prosecutor's rather lengthy argument. Near the beginning of the argument, the prosecutor attempted to answer the insinuation[2] by Meyer's lawyer, Mr. Jones, that Meyer had stated his innocence to the lawyer. The prosecutor permissibly argued:

"You notice that the testimony for the defendant in this case comes basically from Mr. Jones standing up here talking to you. Mr. Jones is the one who tells you that the identification was two seconds. Now, Mr. McCray on the witness stand never said anything about two seconds; that's Mr. Jones' testimony . .

"*Mr. Jones didn't take the witness stand and wasn't sworn, simply because he wasn't out there and was not a personal witness, but that is a legitimate tactic of a defense lawyer*, to draw his conclusions from the facts, and his conclusion is that Mr. McCray couldn't have seen this defendant but two seconds and therefore, Mr. Jones tells us, 'two seconds,' and over and over he says 'two seconds' until when you get back to the jury room, you believe that Mr. McCray admitted it was only two seconds that he saw him. That didn't happen. He saw him the full time that he was out there."

2. Mr. Jones:
   Of course, we criminal attorneys find it actually more difficult to represent a person who is innocent than a person who is guilty; a guilty person can tell you some details that you can probably cross up some of the exam-

(Emphasis supplied). Returning to this theme toward the end of his argument, the prosecutor stated to the jury:

Now, Ladies and Gentlemen of the Jury, this is an open and shut case. There is no question about it. The only questions are the insinuations that a brilliant defense attorney makes. He makes the insinuation that this Defendant has told him that he wasn't guilty, but he won't take the stand under oath and tell you that.

It is this last remark that allegedly infringed on Meyer's right not to testify.

Taken in context, this remark was not "so explicit . . . 'that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify'". *United States v. Bates*, 512 F.2d 56, 58 (5th Cir. 1975) (quoting *Samuels v. United States*, 398 F.2d 964 (5th Cir.), *cert. denied*, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1968)). The prosecutor's remark must be examined in context and only if it was "manifestly intended or of such character that a jury would naturally take it to be a comment on the failure to the accused to testify," does the remark violate *Griffin*. *United States v. Walker*, 559 F.2d 365, 369 (5th Cir. 1977) (quoting *United States v. Jennings*, 527 F.2d 862, 870–71 (5th Cir. 1976)). We agree with the conclusion of the Texas Court of Criminal Appeals that:

In reading the one sentence it is difficult to determine whom the district attorney referred to as "he," i. e. whether he was referring to appellant or to appellant's attorney. When the statement is put in the context of the argument as a whole, it is more probable that the district attorney was not referring to the defendant but to his counsel.

*Meyer v. State, supra*, 416 S.W.2d at 417. The prosecutor's remark was neither intended nor likely to be construed as a com-

ining officers on. A person who says 'I know nothing of it, never been to the station in my life', leaves you nothing to do except listen to the State's testimony and try to find little loopholes that do not jive.

ment on Meyer's failure to testify. *See United States v. Downs*, 615 F.2d 677 (5th Cir. 1980) [4/17/80, slip. p. 4906]. Consequently, this remark did not violate *Griffin* and in no way rendered the trial fundamentally unfair.

Meyer's final claim (issue (v)) is that the pre-trial procedure by which he was identified was impermissibly suggestive. This claim was the major subject of the evidentiary hearing by the federal magistrate below. Meyer was identified by the service station's night manager, Mr. J. I. McCray. During the robbery, McCray viewed his assailant at close quarters and (for a few seconds) the assailant did not wear his dark glasses. At 5:30 in the morning when the robbery occurred, there was ample light for McCray to see the assailant. McCray was a former police officer and had been trained to observe details. Following the robbery, McCray was interviewed by two police department detectives, Bill Landis and James Freeman. Then, at approximately 7:00 a. m., McCray returned home. He slept until called to the police station at 3:00 that afternoon. He was asked to identify a suspect. McCray looked through an observation window and saw Meyer[3] in a room with Detectives Landis and Freeman. The detectives were in plain clothes and Meyer was dressed in clothes different from those worn during the robbery, and was not physically bound. McCray positively identified Meyer, and was then taken to the door of the observation room. A police officer accompanying McCray opened the door and asked, "Is this the man?" McCray replied, "Yes, that's the man that robbed me."

At trial, McCray was the prosecution's prime witness. He unequivocally identified Meyer as the robber. On cross-examination, Meyer's lawyer asked about the pretrial identification procedure. McCray first testified that he did not recognize the plain clothed detectives in the room during the identification. The detectives were, however, the same two that had interviewed McCray earlier in the day. Almost immediately, McCray testified to the reason for this apparent inconsistency in recognition: "To tell you the truth about it, I never even looked at [the two detectives]. I was watching [Meyer]."

We agree with Meyer that the pretrial identification procedure was essentially a "showup" and was probably to a degree suggestive. But we do not agree that Meyer is entitled to habeas relief on this claim. First, we give little weight to the fact that Meyer was not represented by a lawyer, since at that time *Wade*[4] and *Gilbert*[5] had not been decided. Those cases do not retroactively require the presence of a lawyer. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

In this case, our task is to determine whether the showup "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 991, 19 L.Ed.2d 1247, 1253 (1968). Whether McCray's identification at trial was independently reliable depends on the totality of the circumstances, evaluated with special consideration to the following factors:

. . . the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1967); *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1967); *Cronnon v. State of Alabama, supra,* 587 F.2d at 249. Here, McCray had several minutes (five to eight by his estimation) to view the assailant at close range during the

---

**3.** Meyer had earlier been arrested as a suspect for the robbery.

**4.** *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

**5.** *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

robbery, including several moments when the assailant wasn't wearing his dark glasses. The lighting was good. *Manson v. Brathwaite, supra,* also lends significance to McCray's training as a police officer. The record is silent as to the nature of McCray's pre-showup description of the robber. But the magistrate below found that: "The accuracy of the description . . . can be inferred from the fact that the accused was detained within a few hours after the robbery." More importantly, it is clear that McCray demonstrated certainty as to the identification, both at the showup and at trial. And the length of time between the crime and showup was indeed short, amounting to only a few hours.

These factors strongly suggest that McCray's trial identification had an independent source and that there was no substantial likelihood of misidentification. *Cf. Babers v. Estelle,* 616 F.2d 178 (5th Cir. 1980) [4/30/80, slip p. 5200].[6] The factors were also found satisfied by the magistrate and District Court below, following an evidentiary hearing. The findings of fact relating to the factors are not clearly erroneous. *United States v. Olvera,* 523 F.2d 1252, 1255 (5th Cir. 1975); *Kelley v. Estelle,* 521 F.2d 238, 240 (5th Cir. 1975); *Hines v. Beto,* 473 F.2d 1034, 1036 (5th Cir. 1973). As in each of Meyer's previous claims, we find nothing in this claim which rises to a constitutional apogee. The District Court properly denied the petition for habeas corpus.

AFFIRMED.

---

**6.** As the magistrate observed, both *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1968), and *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), where convictions were set aside because of impermissibly suggestive identification procedures, involved confrontations that differed very markedly from the present one. *Foster* involved repeated line-ups and a witness that was uncertain as to which man was the correct one. In *Moore,* the victim heard the prosecutor recite the evidence that tended to implicate the man in question. Those circumstances were not present in Meyer's identification.