**Michael Wayne EVANS,**
**Petitioner-Appellant,**

v.

**O.L. McCOTTER, Director, Texas**
**Department of Corrections,**
**Respondent-Appellee.**

No. 85–1665

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

June 4, 1986.

---

**3.** My criticism is addressed to the Judge, not the counsel, whose actions in accepting this role are completely ethical.

Walter L. Irvin, E. Brice Cunningham, Dallas, Tex., for petitioner-appellant.

Jim Mattox, Atty. Gen., Paula Offenhauser, Austin, Tex., for respondent-appellee.

Before GEE, RANDALL and DAVIS, Circuit Judges.

RANDALL, Circuit Judge:

Michael Wayne Evans, a state prisoner sentenced to death, appeals from the dismissal of his petition for a writ of habeas corpus, 28 U.S.C. §§ 2241, 2254. The district court granted a certificate of probable cause. Upon consideration of the arguments raised, in the context of the entire record, we are convinced that Evans has not proved that his trial suffered from federal constitutional infirmities. Accordingly, we affirm.

## I.

For the purposes of this proceeding, the facts are as follows. 28 U.S.C. § 2254(d). The decomposed bodies of a man and a woman were found on June 30, 1977, covered with bushes and leaves in a field in south Dallas. Both bodies had been shot several times. Police found near the bodies a cylinder pin or ejection rod from a .22 caliber pistol. The woman's body subsequently was identified by her clothing as Elvira Guerrero, who had last been seen leaving evening church services in her car on June 26, with $40 in church offering money. A .22 caliber bullet was removed from her body. The man's body was determined to be Mario Alvarado Garza, who accompanied Guerrero to the church services. On July 11, 1977, police noticed Guerrero's automobile parked in an apartment complex area in Dallas. Police asked residents of the complex questions concerning its ownership, and were told that it may have belonged to Belinda Key, whose apartment was about 15 feet from where the car was parked. Police entered the apartment with Key's consent, but Evans, who was living in the apartment, fled unnoticed out a back window. They recovered, from a dresser drawer in a bedroom, a .22 caliber revolver (of a type commonly called a "Saturday Night Special") with its ejection rod missing. Key stated that the pistol belonged to Evans. Questioning of Key convinced officers that Evans was a suspect in Guerrero's slaying. Officers took a palm print from Guerrero's car, which was subsequently identified as belonging to Evans.

Evans returned to the apartment within a few hours, and he was arrested at 4:30 p.m. on July 11. A Dallas police officer gave Evans *Miranda* warnings immediately. Evans was removed to Dallas police headquarters where, before questioning, he was again administered *Miranda* warnings. Evans stated that he understood the warnings, and that he wanted to talk. In fact, he talked with the police officers for about two hours. He implicated another individual, Stanley Earl Smith, in the slayings. Police went with Evans to the housing project where Smith lived, then intended to drive to the home of a justice of the peace for arraignment. While driving to the justice of the peace's home, and in response to further police questioning by different officers than had questioned him previously, Evans told police that he would

show them where the keys to Guerrero's car had been thrown, in shrubs near a school.[1] Police searched the area, but did not find the keys. Police then took Evans to the justice of the peace, who, for a third time in less than six hours, administered *Miranda* warnings. Evans was brought back to the police station at 10:15 p.m., where police asked if he remembered the warnings. After a little over one hour of further questioning, Evans made a written statement admitting having robbed Guerrero and Garza, but assigning primary responsibility for the slayings to Smith.[2]

The next day, July 12, police again searched for the car keys where Evans said he had thrown them. Although they were unsuccessful, a member of a maintenance crew trimming the shrubs found a set of keys, and turned them over to police. The keys fit Guerrero's car. Later on July 12, police resumed questioning Evans, after again giving him *Miranda* warnings. Ev-

ans admitted to having participated in the robbery and murder of an individual named David Lee Potts about two weeks before the killing of Guerrero, but stated that Smith had actually killed Potts.

On July 14, 1977, three days after his arrest, police removed Evans from the jail and transferred him to the police station. While driving to the station, one officer told Evans his July 11 statement was not believable. Evans responded that officers should "give him some time and he would think about it." Later that day, while at the jail, Evans initiated a conversation with police, and said that he wanted to make another statement. Police twice more provided *Miranda* warnings, after which Evans confessed to having killed Potts in a robbery on June 15, 1977. After another *Miranda* warning—the seventh within three days—Evans confessed in a written statement to having killed Guerrero.[3] At

---

**1.** Evans contended before the state court that police coerced him into making this statement, and he testified at a pre-trial suppression hearing that he would not have made the statement, except for coercion and threats by the police, such as officers' pulling Evans' hair and slapping him in the head. The trial court, after hearing testimony to the contrary from police, found that police did not coerce Evans and that his statement was voluntary. While the latter conclusion is a question of law subject to independent federal determination, *Miller v. Fenton,* —— U.S. ——, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985), the "subsidiary factual question" of "whether in fact the police engaged in the intimidation tactics alleged by the defendant" is entitled to a presumption of correctness. *Id.* at 451 (citing *LaVallee v. Delle Rose,* 410 U.S. 690, 693–95, 93 S.Ct. 1203, 1205–06, 35 L.Ed.2d 637 (1973)). For the purposes of this proceeding, in light of the record evidence at the suppression hearing, we must presume to be correct the state court's finding that "there was no coercion or mistreatment or any physical force used against the defendant to cause him to make said statements." Ruling of Trial Court on Defendant's Motion to Suppress, *State Trial Record v. VIII,* at 686 (Oct. 1, 1981).

**2.** The July 11, 1977 statement said in its entirety:

On 6/26/77, Earl Smith Picked me up on N. Bennett. I was at school shooting a basketball. Earl said "Mickey I've got a hustle for us." There was a man and a woman in the back seat. Earl was holding a pistol on them. I got in the front seat and drove where

Earl told me to. I parked by a little Church on the corner. Earl told them to get out. He took them a short distance and shot them. I heard about five shots. Earl got back in the car and gave me two $10 bills. I drove off. We went to Belinda Key's apt on Bennett Street. Earl told me not to say anything or he would have something done to me. I drove the car around until the brakes went out. One day about a week ago I was driving the car with Earl and my girl friend Juanita. Earl had a friend with him. He noticed somebody following us. He told me to let him get out. They got out but the Mexican kept following me. I drove S. on the highway to Houston and lost him in South Dallas. Then I drove back to N. Dallas and let Juanita out at her house.

While I was driving where Earl told me to I knew he was going to rob them.

**3.** The July 14 statement regarding the Guerrero slaying read in its entirety:

On June 26, 1977 at about 6:00 p.m., I was at Belinda's house at 1612 N. Bennett St. Earl Smith came over and wanted me to go with him to get some money. I told him I would go and I got my pistol out of the dresser drawer. I checked the pistol and it was loaded with six .22 bullets. I've had this pistol about two months. I stole the pistol out of the Cole Apartments where I saw a couple of people moving. I waited for them to drive off with a load of furniture, then I went inside the apartment and got the pistol off of a shelf in a bedroom. I also took some champagne

no point in the interrogation process, from the time he was arrested, did Evans request an attorney.

At the trial of Evans, the State introduced evidence that at about midnight on June 27, Evans returned to Key's apartment with blood on his hands and clothing. On June 27, a companion of Key helped Evans clean "blood and flesh" from the inside of Guerrero's car, and brought it back to Key's apartment complex. Key asked Evans where he got the car, and he responded that he and Smith "had jacked [4] some people and hit them in the head and tied them up and covered them with bushes." Evans' girlfriend, Juanita Ingram, was also at the apartment when Evans returned in the early morning hours of June 27. Evans told Ingram that he killed some Mexicans, and gave her a watch from "the Mexican lady that he had killed." Finally, Evans told his cousin, Stanley Robinson, in response to a question concerning how he obtained the car in which he was riding, that he took it from a couple that he had killed.

The jury returned a verdict of capital murder and sentenced Evans to death. The Texas Court of Criminal Appeals reversed the judgment and remanded for a new trial because certain prospective jurors

glasses from the apartment. Earl and I started walking toward a park near Ross Avenue. When we got to the park, we saw a brown and black Pontiac Firebird parked on the side street by the park. A Mexican woman was sitting in the driver's seat and a Mexican man was sitting in the front seat next to her. They were just talking. We walked by the car and looked it over. Earl had my pistol and I had a hook-blade knife. We walked back to the car and Earl stuck the pistol in the lady's face and I pulled the knife on the dude. Earl told the lady that we wanted to get out of this part of the town. The lady offered to take us and Earl told her that we'd take ourselves. Earl told the lady to get into the back seat and I got into the back seat with her. Earl started driving the car and the dude was in the front seat. The dude started jabbering in Spanish and Earl told him to shut up. The lady asked us if we wanted their money. Earl told her that all we wanted was a ride across town. The lady handed me an envelope with about $40.00 in it. I took the money and put it in my pocket. The dude handed Earl his wallet and Earl put the money out of the wallet into his (Earl's) pocket. I think it was about $12.00. Earl drove across town to a big field. Earl parked the car by a big tree. Earl gave me the gun. As soon as the car stopped moving, the Mexican lady said, "you don't have to kill us, we won't tell anybody." Earl looked back at me and said, "you know what it is." I then shot the Mexican lady two or three times. The woman fell over in the seat and the dude jumped out of the car and started running. I handed Earl the pistol and Earl started running after the dude. Earl shot one time at the dude but I think he missed. A few seconds passed and I heard two more shots. I couldn't see Earl or the dude. About this time, the lady took my hand in hers and I realized she was still alive. She was holding my hand and looking into my eyes. Then she said, "God help him, God, help him." I took my hook-blade knife out of my pocket. I cut the lady from the bottom of her chin to her hairline above her forehead. Then the lady said, "God forgive him." I cut the lady two more times in the face. I think I cut her eyes. I was trying to get her to quit talking. All of a sudden the lady turned loose of my hand and quit breathing. I sat there in the car looking at the woman until Earl opened the car door. Earl told me to help him drag the lady out of the car. We dragged the woman over in some bushes. We covered the lady up with some bushes. Then Earl went over to the dude who was laying on the ground dead. Earl took the dude's shoes off. Earl had already covered the man up. Earl got the knife from me and went back to the man. I think Earl was cutting the man. We tried to straighten the grass up so it wouldn't look like a car had been there. We started driving up to a church and Earl said the rod was missing out of the pistol. We parked the car and started looking for it but couldn't find it. Earl said it must have fallen out of the pistol when he shot the dude. We drove the car back to Belinda's house and went inside and got some rags to clean the blood out of the car. Joseph, a boyfriend of Belinda's, helped Earl and I clean the blood out of the car. The next day Belinda gave me some pills. I took four of the pills and got high. I told Belinda that Earl and I had killed the Mexicans and that we had their car. Earl was in the bedroom laying across the bed. My girlfriend and I went to the store and got some beer. When we got back, Belinda and Earl were in bed making love. Juanita and I sat on the sofa and drank beer and smoked weed until about midnight. Then Juanita went home and I went to sleep. I drove the car everyday and I took Earl to work in the car. We kept the car until the police came and got it.

4. Testimony indicated that "jacked" means robbed.

were improperly excused in light of *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). *Evans v. State*, 614 S.W.2d 414 (Tex.Crim.App.1980) (en banc). The jury again convicted Evans and, after a hearing at which the state and the defense presented witnesses, sentenced him to death. The conviction was affirmed on direct appeal. *Evans v. State*, 656 S.W.2d 65 (Tex.Crim.App.1983) (en banc), *cert. denied*, 465 U.S. 1109, 104 S.Ct. 1616, 80 L.Ed.2d 145 (1984).

Evans filed a petition for writ of habeas corpus in the state convicting court, which was denied in August 1984. He filed a second petition in state court immediately thereafter, which also was denied.

The instant federal petition, prepared with the assistance of counsel who represented Evans at trial, was filed on October 10, 1984. The magistrate in a written opinion recommended that the petition be dismissed without a hearing. The district judge adopted that recommendation, but granted Evans a certificate of probable cause to appeal.

## II.

Evans raises numerous grounds for relief in his petition, which may be divided into six general categories: (A) *Miranda* violations in connection with the statement that allowed police to recover the keys to Guerrero's car; (B) flaws in the grand jury and petit jury selection process; (C) various evidentiary rulings at the guilt/innocence and punishment phases of the trial; (D) insufficiency of the evidence to support the death sentence; (E) disproportionality of the death sentence to the offense; and (F) a wholesale attack on the Texas death penalty statute.

### A. *Miranda Claims.*

■ Evans was arrested at 4:30 p.m. on July 11, taken to police headquarters, then to jail. At about 7:30 p.m., after having been removed from the jail, and apparently in response to police questioning, he told police where he had thrown the keys to Guerrero's car. Although within this three-hour period Evans was twice given *Miranda* warnings, before going to jail, he was not so warned upon being picked up from the jail. The trial court admitted evidence of this oral statement over Evans' objection. Evans appears to contend that when police re-initiated interrogation at about 8:00 p.m., they should again have warned him of his rights, although they had twice done so in the preceeding three hours, and Evans had not indicated a lack of willingness to talk and had not requested an attorney.[5]

As the Supreme Court has stated repeatedly, "custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Moran v. Burbine*, ── U.S. ──, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966)). The Supreme Court recently summarized the rationale of *Miranda*, as well as its limits:

To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealing with the accused. In particular, prior to the initiation of questioning, they must fully apprise the suspect of the state's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present ... if [he] so desires." *Id.* at 468–70, 86 S.Ct. at 1624–26. Beyond this duty to inform, *Miranda* requires that the police respect the accused's decision to exercise the

---

**5.** Evans does not challenge admission of the two subsequent written statements in which he actually confessed to the killings, *supra* notes 2–3. If he had, our analysis would be controlled by *Oregon v. Elstad*, ── U.S. ──, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222 (1985) ("a suspect who has once responded to unwarned yet uncoerced questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings").

rights outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease."

*Burbine,* 106 S.Ct. at 1140–41.

The question we face is whether Evans validly waived the rights conveyed by *Miranda* warnings when the interrogation was reinitiated by police without a repeated warning. The Court in *Burbine* reviewed the standard to determine whether a waiver of fifth amendment rights was valid:

> Echoing the standard first articulated in *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), *Miranda* holds that "[t]he defendants may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S., at 444, 475, 86 S.Ct., at 1612, 1628. The inquiry has two distinct dimensions. *Edwards v. Arizona, supra,* 451 U.S., at [477] 482, 101 S.Ct. at [1880] 1883; *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

106 S.Ct. at 1141.

The issue raised by Evans appears to concern the second aspect of the test set forth in *Burbine,* namely the "awareness of the right being abandoned and the consequences of the decision to abandon it." It is incomprehensible how, under the facts of this case, Evans admittedly was aware of his rights, voluntarily and expressly waived them, and conversed with police from about 4:30 to 6:30 p.m. on July 11, then forgot his rights at about 7:30 or 8:00 p.m. when police re-initiated questioning. Upon an independent federal examination of voluntariness, *Miller v. Fenton,* — U.S. ——, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1986), Evans' statement to police concerning the location of the keys to Guerrero's car was, under the "totality of the circumstances," an uncoerced choice made with the requisite level of comprehension, made following an express oral waiver of the rights protected by *Miranda* warnings. *See Burbine,* 106 S.Ct. at 1141.[6]

### B. *Jury Issues.*

■ Evans' second group of arguments concerns the composition of the grand jury

---

**6.** Evans argues further that admission of the oral statement violated Tex.Code Crim.P.Ann. art. 38.22, § 3(a) (Vernon 1979), which states in part that such a statement is admissible "for the purpose of impeachment only," and only if the statement is recorded. The Texas Court of Criminal Appeals rejected this claim, holding that current art. 38.22, § 3 was not in force at the time of Evans' statement in 1977, and that its predecessor, which did not require recording of oral statements, apparently was not offended. 656 S.W.2d at 66. Regardless of whether the statement was properly admitted as a matter of the Texas law of evidence; the alleged error must violate the *federal* constitution or *federal* laws in order for the writ to be granted. 28 U.S.C. § 2254(a); *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963); *Johnson v. Blackburn,* 778 F.2d 1044, 1050 (5th Cir.1985). "As a general rule, admissibility of evidence is a matter of state law, and only a contention that the [improper] admission of the evidence rendered the trial fundamentally unfair or violated a specific constitutional right will be considered in a federal collateral proceeding." *Id.* (citing *Meyer v. Estelle,* 621 F.2d 769, 771 (5th Cir.1980)). As noted above, the admission of Evans' oral statement did not violate a specific federal constitutional right. As to whether the admission of the testimony was improper as a matter of state law, the Texas Court of Criminal Appeals ruled that it was not, and "[w]e will take the word of the highest court on criminal matters of Texas as to the interpretation of its law, and we do not sit to review that state's interpretation of its own law." *Seaton v. Procunier,* 750 F.2d 366, 368 (5th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 110, 88 L.Ed.2d 90 (1985).

and petit jury. First, as to the grand jury, Evans contends that "the jury selection system operated to exclude from service as grand jurors an identifiable class of citizens of eligible jurors in the community, Negroes, Mexican-Americans, and Eighteen-to-Twenty One Year Olds," assertedly in violation of the due process and equal protection clauses. The state trial court held a hearing on this issue at which testimony concerning the grand jury selection process in general and in Evans' case in particular was taken. One of the five grand jury commissioners who selected the term grand jury which ultimately indicted Evans was black. Of the twelve members of the July 1977 term grand jury, two were black. Accordingly, 20% of the commissioners and 16% of the grand jury members were members of Evans' race. Review of the facts adduced must be considered in light of the principles set forth in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), and *Enriquez v. Procunier*, 752 F.2d 111 (5th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2658, 86 L.Ed.2d 274 (1985):

> In order to secure federal habeas relief on this ground [petitioner] must: (1) establish that the group against whom discrimination is asserted is a recognizable, distinct class, singled out for different treatment; (2) prove that the group has been underrepresented over a significant period of time; and (3) support the presumption thus created by showing that the selection procedure is susceptible of abuse or is not racially neutral.

*Id.* at 115.

At no point in the state proceedings did Evans introduce evidence tending to show that the representation of minorities on his or any other grand jury was a "significant underrepresentation," *Castaneda v. Partida*, 430 U.S. at 494, 97 S.Ct. at 1280, in light of the actual racial composition of Dallas County. Evans did not prove, "by

comparing the proportion of the group in the total population to the proportion called to serve as grand jurors," *id.*, that minorities are in fact underrepresented, therefore he did not prove a *prima facie* case of unconstitutional exclusion of blacks or Hispanics. Even assuming that a claim of "systematic exclusion" of individuals between 18 and 21 years old may state a claim cognizable under *Partida*, which would require us to accept the proposition that such a class is a "recognizable, distinct class, singled out for different treatment under the laws, as written or applied," 430 U.S. at 494, 97 S.Ct. at 1280, the claim fails for the same reasons. There is no record evidence of the degree of underrepresentation of the "class." Accordingly, the challenge to the makeup of the grand jury commissioners and the July 1977 term grand jury must fail. ·See also *Guice v. Fortenberry*, 661 F.2d 496, 499–500 (5th Cir.1981) (en banc).

▬ Second, Evans contends that the composition of the jury that convicted him was flawed, in that the trial court wrongfully excluded five veniremen for cause, in violation of the principles set forth in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The state contends that review of the claim is barred by the procedural default doctrine of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Trial counsel did not object to the exclusions, and the Texas Court of Criminal Appeals expressly refused review of the claims for failure to make a contemporaneous objection. *Evans v. State*, 656 S.W.2d at 67. The federal district court declined to review the claim in light of *Sykes*. Nevertheless, Evans makes no attempt to fit the claim into an exception to *Sykes, see generally Johnson*, 778 F.2d at 1047. Accordingly, we must conclude that we are barred from reviewing the merits of the *Witherspoon* claim.[7] Even if *Sykes* did not bar review of the

---

7. In Catz, *Federal Habeas Corpus and the Death Penalty: Need for a Preclusion Doctrine Exception,* 18 U. Cal.-Davis L.Rev. 1177 (1985), the author contends that the *Sykes* preclusion doctrine should be inapplicable in death penalty

cases. *Id.* at 1196–1210. However, as the author notes, that proposal has not been adopted in this circuit. *O'Bryan v. Estelle,* 714 F.2d 365, 383 (5th Cir.1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984); *Gray v.*

claim, however, there would be little question that the five prospective jurors who were excused for cause were properly excluded. First, it should be noted that the determination by the trial judge that a potential juror's views might substantially impair his performance as a juror is a finding of fact entitled to a presumption of correctness.· 28 U.S.C. § 2254(d); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 853–55, 83 L.Ed.2d 841 (1985). *See also Wicker v. McCotter,* 783 F.2d 487, 493 (5th Cir.1986) (*Witt* test is "to be applied primarily by the trial court, for determinations of juror bias depend in great degree on the trial judge's assessment of the potential juror's demeanor and credibility, and on his impressions about that venireman's state of mind"). Second, each of the five stated that they would automatically answer "no" to one of the three questions in Tex.Code Crim.P. Ann. art. 37.071(b) that all must be answered affirmatively in order to sentence Evans to death.[8] Under these circumstances, there is substantial record evidence to support the conclusion that the "juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt,* 105 S.Ct. at 852 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)).

C. *Evidentiary Rulings.*

1. *Impeachment of Evans' Witness.*

Evans called his confederate, Earl Stanley Smith, as a witness during the defense's case-in-chief at the guilt/innocence phase of the trial, against the sound advice of his counsel. The trial judge warned Evans at length that Smith "may give testimony injurious to the defendant's case." On cross-examination, Smith testified that Evans shot both Guerrero and Garza and cut Guerrero's throat, and that Evans had tried to convince him to testify falsely. Defense counsel attempted to impeach Smith through evidence that he had already pled guilty to the Guerrero, Garza and Potts murders and received a life sentence, and through evidence of eight prior unrelated convictions of Smith. Evans did not allege that Smith's plea bargain gave him a motive to falsify his testimony. The trial court had already granted the State's motion *in limine* to prevent such impeachment, finding that under Tex.Code Crim.P. Ann. art. 38.28, a party may not impeach his own witness "merely by offering evidence of the witness' bad character."

▌ Again, we do not review this evidentiary ruling as if we were a state appeals court. Only if the refusal to allow the impeachment, if incorrect, rendered the trial "fundamentally unfair" or violated a specific constitutional right would federal collateral relief be appropriate. *Johnson,* 778 F.2d at 1050. In order for a trial to be rendered fundamentally unfair due to an evidentiary error, the evidence admitted must be "crucial" or "devastating." *Id.*

*Lucas,* 677 F.2d 1086, 1109 (5th Cir.1982), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983). *See* Catz, *supra,* 18 U. Cal.-Davis L.Rev. at 1207 n. 175.

8. Tex.Code Crim.P.Ann. art. 37.071(b) states:
   (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
   (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
   (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.
Prospective Juror No. 23 stated "I would have to vote 'no' on one of them." Prospective Juror No. 7 said one answer "would have to be 'no'" because "I don't believe in death." Prospective Juror No. 74 answered "yes, sir" in response to defense counsel's question that "one of those questions you would answer 'no' automatically?" Prospective Juror No. 75, stated that "I am firm" that he would automatically answer one question "no" because "I just couldn't do it myself." Finally, Prospective Juror No. 81 stated that he was "firm" that he would "answer 'no'" .to at least one question because "I don't really feel that the State has the right to take a life."

We simply cannot conclude that Smith's testimony was "crucial" or "devastating." Evans' graphic written statements to police, his oral statements to witnesses who testified against him at trial, as well as substantial physical evidence, identified him as the killer of Guerrero. Indeed, the prosecution did not call Smith in its case-in-chief. Smith's testimony was essentially cumulative; thus it was not "crucial." *Id.* at 1051. As the district court concluded, in "the context of the issue of guilt or innocence the credibility of Smith was irrelevant."

▇ As to whether the ruling violated a specific constitutional right, namely the confrontation clause, cross-examination must be permitted into any incentive the witness may have to falsify his testimony. *Davis v. Alaska,* 415 U.S. 308, 317, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974).[9] However, Evans did not contend at trial and does not contend now that Smith's testimony was falsified as a result of his plea arrangement. Rather, he contends simply that the evidence would show Smith's bad character. The confrontation clause does not require the admission of "all character evidence of whatever relevance and probative value." *Cloud v. Thomas,* 627 F.2d 742, 744 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1760, 68 L.Ed.2d 239 (1981). Aside from the limited inference that a convicted felon has a propensity to lie, the evidence Evans sought to offer had no relevance to the issue of Smith's truthfulness. The refusal to admit evidence of such limited value did not violate the confrontation clause. *Id.* at 745. Moreover, even if the refusal to allow the impeachment offended the confrontation clause, in light of the relative unimportance of Smith's testimony to the prosecutor's case, its cumulative nature, the weighty evidence corroborating Smith's testimony, and the overall strength of the prosecutor's case, the error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall,* —— U.S. ——, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

### 2. *Evidence of Mitigating Circumstances.*

▇ Evans next challenges the refusal of the trial court to allow him to present "mitigating evidence" at the punishment phase. The scope of evidence of mitigating factors that may be presented at a presentence hearing is wide, because "it is desirable to have as much information before [the jury] as possible when it makes the sentencing decision." *Gregg v. Georgia,* 428 U.S. 153, 203–04, 96 S.Ct. 2909, 2939–40, 49 L.Ed.2d 859 (1976) (plurality opinion), *quoted with approval in Zant v. Stephens,* 462 U.S. 862, 886–87, 103 S.Ct. 2733, 2747–48, 77 L.Ed.2d 235 (1983). The jury "must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." *Jurek v. Texas,* 428 U.S. 262, 271, 96 S.Ct. 2950, 2956, 49 L.Ed.2d 929 (1976) (joint opinion). Insofar as the likelihood or unlikelihood of a defendant's committing future crimes is a constitutionally acceptable factor to be considered before imposing the death penalty, which it is, *O'Bryan,* 714 F.2d at 386, the jury should be presented with "all of the relevant information" on the issue, *Barefoot v. Estelle,* 463 U.S. 880, 897, 103 S.Ct. 3383, 3396, 77 L.Ed.2d 1090 (1983).

▇ Evans attempted to introduce evidence that he had earlier pled guilty to the killing of Potts, and received a life sentence. The relevance of that evidence is not immediately apparent. There is no explanation, in either the petition or Evans' brief on appeal, of the relevance of that evidence to the sentencing decision. Indeed, the Court of Criminal Appeals rejected Evans' contention that the evidence should have been admitted because, in part,

---

**9.** Evans' confrontation clause right is not lessened by the fact that he, rather than the State, called Smith: "[t]he right of confrontation does not depend upon whether the witness was put on the stand by the accused or the prosecution." *United States v. Morgan,* 757 F.2d 1074, 1077 (10th Cir.1985) (citing *Chambers v. Mississippi,* 410 U.S. 284, 298, 93 S.Ct. 1038, 1047, 35 L.Ed.2d 297 (1973)).

"he gives no reasons" to explain its relevance. Absent some indication of the relevance of the evidence, Evans' conclusory, one-sentence allegation that "the Court should take into consideration that the Appellant [has] already been Sentenced to Life Imprisonment" must fail.[10]

Further, Evans contends, without citation to authority, that he should have been allowed to introduce evidence at the punishment phase that Smith received a life sentence for his role in the killings. That evidence, however, has no bearing on Evans' culpability or likelihood of future dangerousness. As the Texas Court of Criminal Appeals stated, "[e]ach defendant should be judged by his *own* conduct and participation and by his *own* circumstances." *Evans*, 656 S.W.2d at 66–67.

### D. *Sufficiency of the Evidence.*

██ Evans further challenges the sufficiency of the evidence to support a death sentence: in light of "numerous circumstances," the death penalty is inappropriate, such as "extenuating circumstances" that led to the crime, and his "remorse." Evans did not attempt to introduce to the jury evidence on many of these points; but he was not foreclosed by the trial judge from so doing. In fact, he did introduce evidence of his conversion to Christianity. Moreover, Evans' counsel argued to the jury that there was no evidence that Evans had committed any criminal acts while in prison, therefore he was not a continuing threat to society. The state, on the other hand, introduced evidence of aggravating circumstances, namely Evans' killing of Potts less than two weeks before Guerrero's slaying, the heinous nature of the killings, an extensive violent criminal record, and Evans' apparent lack of remorse after the killings. That evidence was sufficient to support the jury's findings that Evans acted deliberately, that he would be a continuing threat to society, and that the killing was not reasonable in light of provocation, if any, under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 324, 99

**10.** It is crucial to note that the proffered evidence concerned only the fact that Evans received a life sentence for the murder of Potts. *See* Transcript of State Trial, vol. X, at 1259–61. He was *not* barred from introducing evidence that he had been peaceful and well-adjusted while in prison awaiting trial for either Potts' or Guerrero's killings. In fact, he introduced evidence of his conversion to Christianity while in prison. *See infra* at *D. Sufficiency of the Evidence.* Accordingly, the exclusion of evidence of Evans' life sentence for Potts' slaying was not improper in light of the Supreme Court's recent decision in *Skipper v. South Carolina*, 39 Crim. L.Rep. (BNA) 3041 (U.S. Apr. 29, 1986). In *Skipper,* the Court determined that the defendant should have been allowed to introduce evidence that, while he was in prison awaiting trial, he "had been a well-behaved and well-adjusted prisoner," because of the possible "favorable inferences from this testimony regarding petitioner's character and his probable future conduct if sentenced to life in prison." *Id.* at 3042. The Court held that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *Id.* The critical difference between the ruling of the trial court in *Skipper* and the ruling of the trial court in this case is that the prisoner in *Skipper* was prevented from introducing evidence on his peacefulness in prison (in the form of the testimony of two jailers and one " 'regular visitor' to the jail to the

effect that petitioner had 'made a good adjustment' during his time spent in jail," *id.*), and Evans was not. The evidence concerning Evans' sentence for Potts' murder simply did not go to that, or any other, relevant issue. *Skipper* is of no help to Evans.

The prosecution presented no direct evidence concerning Evans' adjustment to prison life. Evans' counsel argued to the jury that the lack of evidence that Evans had committed violent acts while incarcerated precluded a finding of a probability of future dangerousness:

> Now, whatever they are doing to him, I submit, says that is effective. It is accomplishing its purpose. It is stopping him from being— well, one, from committing criminal acts of violence or any criminal acts, whether its capital murder, as you found, or possession of Valiums. And that he no longer is a continuing threat to society.

The jury, however, had sufficient evidence to conclude otherwise, as noted *infra* under *D. Sufficiency of the Evidence.*

Further, the prosecution did not argue to the jury that Evans "could not be trusted to behave if he were simply returned to prison," as had the prosecution in *Skipper. Id.* n. 1. Accordingly, the due process requirement of *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977) (defendant may not be sentenced to death "on the basis of information which he had no opportunity to deny or explain"), was not violated by the trial court.

S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979), and *O'Bryan*, 714 F.2d at 386.

### E. *Proportionality.*

■ Evans next asks this court to conduct a proportionality review, arguing that "death is a disproportionately severe and therefore excessive punishment in appellant's case in view of the circumstances of the offense." Evans does not have a federal constitutional right to any type of proportionality review, so long as the state's capital punishment scheme protects against arbitrary and capricious imposition of the death penalty. *Mattheson v. King*, 751 F.2d 1432, 1446 (5th Cir.1985), *cert. dismissed*, —— U.S. ——, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986). The Supreme Court in *Jurek* specifically upheld the Texas system against an eighth amendment challenge, because Texas narrowed its definition of capital murder, required proof of at least one statutory aggravating circumstance, and allowed the defense to introduce evidence of mitigating circumstances.

### F. *Facial Validity of Statute.*

■ As general attacks on the Texas death penalty statute, Evans contends that the statute impermissibly bars introduction of evidence of mitigating factors, such as mental distrubances, a "history of deprivation and misfortune," and the possibility that Evans "will not commit future acts of criminal violence." This argument is squarely foreclosed by *Jurek v. Texas*, 428 U.S. 262, 273, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976) (joint opinion) (under Texas death penalty statute "the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it"); *id.* at 279, 96 S.Ct. at 2959 (White, J., concurring in the judgment), and our recent decision in *Esquivel v. McCotter*, 777 F.2d 956, 957 (5th Cir. 1985) (Texas statute provides jurors with sufficient guidance in considering evidence of mitigating factors). *Cf. Pulley v. Har-*

*ris*, 465 U.S. 37, 48, 104 S.Ct. 871, ·878, 79 L.Ed.2d 29 (1984) (Texas statute authorizes defense "to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced," quoting *Jurek* ).

■ Evans also states that the Texas death penalty statute, even if facially constitutional, has been applied unconstitutionally in the past, because death sentences have been more frequently imposed on blacks who kill whites. Further, he contends that the penalty is applied more frequently to ethnic minorities. These conclusory assertions, without an allegation that the state engaged in intentional discrimination against Evans in particular, provide no basis for collateral relief. *Prejean v. Maggio*, 765 F.2d 482, 484 (5th Cir.1985); *Moore v. Maggio*, 740 F.2d 308, 321–22 (5th Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985); *see also McCleskey v. Kemp*, 753 F.2d 877, 890 (11th Cir.1985) (en banc).

■ Finally, Evans contends that the death penalty is "unjustified as a means for achieving any legitimate governmental end." To the extent that this states a constitutional claim, it is settled that the death penalty may, as a general rule, be imposed on individuals for capital murder who themselves killed, attempted to kill, or intended that a killing take place. *Cabana v. Bullock*, —— U.S. ——, 106 S.Ct. 689, 697, 88 L.Ed.2d 704 (1986); *Enmund v. Florida*, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140 (1982). Evans' claim to the contrary is without merit. *Pulley v. Harris*, 465 U.S. at 43, 104 S.Ct. at 875 ("death penalty is not in all cases a disproportionate penalty").[11]

### III.

For the foregoing reasons, the district court's dismissal of the petition for a writ

---

11. Evans contended in the petition that death by injection of a substance unapproved for such use by the federal government violated federal food and drug laws. *But see Heckler v. Chaney,*

—— U.S. ——, 105 S.Ct. 1649, 1659, 84 L.Ed.2d 714 (1985). He has not briefed this issue on appeal, therefore we consider it waived.

of habeas corpus if AFFIRMED. The stay of execution previously entered in this case is VACATED.