Joseph W. **JOHNSON**,
Petitioner-Appellant,

v.

Frank **BLACKBURN**, Warden,
Louisiana State Penitentiary,
Respondent-Appellee.

No. 84–4077.

United States Court of Appeals,
Fifth Circuit.

Dec. 17, 1985.

N. Graves Thomas, Shreveport, La., for petitioner-appellant.

John A. Broadwell, Asst. Dist. Atty., Shreveport, La., for respondent-appellee.

Before ALVIN B. RUBIN, RANDALL and Jerre S. WILLIAMS, Circuit Judges.

**OPINION**

RANDALL, Circuit Judge:

During the early-morning hours of June 28, 1979, Estella Allen was shot and killed in her house in Shreveport, Louisiana. Her ten-year old son Jimmy Allen, Jr., was wounded by a gunshot while he lay in bed. Estella Allen's "boyfriend," Joseph W. Johnson, was convicted by a jury of second-degree murder and attempted second-degree murder in connection with the shootings. Johnson appeals the dismissal of his petition for a writ of habeas corpus, 28 U.S.C. §§ 2241, 2254, by the United States District Court for the Western District of Louisiana. We affirm.

**I.**

Based on the record of the state court trial, the facts for the purpose of considering this petition are as follows. 28 U.S.C. § 2254(d). In 1979, Johnson alternatively lived alone, with his estranged wife Juanita, and with a girlfriend of almost two years, Estella Allen, who was also married but separated. Johnson frequently visited and stayed at Estella's house. Jimmy Allen, Jr., lived with her. Estella's husband, Jimmy Sr., was on active duty in the Navy.

At about midnight on June 28, 1979, Estella and Jimmy Sr. spoke by telephone and decided to attempt a reconciliation of their marriage, cancelling their plans for a divorce.[1] The conversation ended at around 1:30 a.m. on June 28. Estella and Jimmy Jr. were alone in the house at the time.

At around 3:00 a.m., Jimmy Jr. was awakened from his sleep by a loud argument between his mother and a man whose voice he testified he recognized as Johnson's. Estella told Jimmy Jr. to call a relative on the telephone for help, but Johnson told Jimmy Jr. that he would shoot the boy if he used the phone. Jimmy Jr. stayed in his bed. Shortly thereafter, according to his testimony, Jimmy Jr. heard a gunshot. Johnson then entered the boy's

---

1. This evidence was introduced through the testimony of Jimmy Sr. Further evidence on this point was introduced by the State through acquaintances of Estella, Clara Bolden and Ann Thomas. That testimony is considered in more detail *infra*.

bedroom and shot him one time. Jimmy Jr. was hit in the shoulder, but the wound was not serious, and after the assailant left he got out of bed and saw his mother bleeding from a neck wound and unconscious by the front door. He went to a neighbor's house, where he used the telephone to call his grandmother. He told her that "Joe" shot his mother.

The neighbors called police, who arrived within a few minutes. Jimmy Jr. told police that Johnson was responsible for the shootings. Police immediately considered Johnson to be a suspect, and three officers went to Johnson's house a short distance away in an unsuccessful attempt to locate him. They discovered his car in the driveway, and its hood and grill felt warm to the touch. The officers concluded it had recently been driven. Police impounded the car, and it was towed to a service station. Meanwhile, investigators at Estella's house recovered the two bullets, and concluded that they were .38 caliber.

Johnson called Estella's father at 10:00 a.m. on June 28 and asked to speak to her. Her father told Johnson that she had been killed, and that "the people," or the police, were looking for him. Shortly thereafter, Johnson went to the police station, where he was placed under arrest. He admitted to police at that time that he had a .38 caliber pistol. Several days later, Johnson's wife Juanita was interviewed by police. She stated at that time that Johnson spent at least part of the night of the 27th and morning of the 28th with her, but "couldn't say" when he had arrived.

Trial in the First Judicial District Court, Parish of Caddo, Louisiana, commenced on April 4, 1979, after extensive pre-trial motion practice. Johnson advanced an alibi defense, arguing that he had spent the entire night with his wife, Juanita Johnson, and that he had no contact with Estella the evening she was killed. His wife corroborated that testimony, stating that Johnson was in bed with her at 2:30 a.m. when she got up to take medication, and at 7:30 a.m. when she awoke for the day.

The trial court instructed the jury on the elements of second-degree murder and voluntary manslaughter in the killing of Estella, and attempted second-degree murder in the shooting of Jimmy Jr. The court instructed the jury that, as to all three crimes, "the state is required to prove that the accused had specific intent to commit the crime charged." It then defined specific intent, in accordance with the Louisiana Criminal Code, Article 10, as "that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." The court instructed the jury that second-degree murder requires proof of specific intent to kill or inflict great bodily harm and followed this with this instruction:

> In order to convict the defendant of second degree murder you must find that the defendant killed Estella Allen, and that the defendant acted with a specific intent to kill or inflict great bodily harm.

Following this, the court gave an identical specific intent instruction for the crime of voluntary manslaughter, adding "but the killing is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection." The court then added an instruction on the intent element of all three crimes that "[a]s a general rule applicable in all criminal cases, including those where a specific intent is an element of the crime, the accused is presumed to intend the natural and probable consequences of his voluntary acts, knowingly performed." Defense counsel did not object to the instruction.

The jury returned guilty verdicts on the second-degree murder and attempted second-degree murder counts. The court sentenced Johnson to life in prison at hard labor without benefit of or eligibility for parole, probation or suspension of sentence for forty years on the murder conviction, and to thirty years at hard labor on the attempted murder conviction. The sentences were ordered to be served consecutively. The Louisiana Supreme Court af-

firmed his conviction. *State v. Johnson*, 381 So.2d 436 (La.1980).

Johnson filed an application for a writ of habeas corpus in Louisiana state court, which the district court denied on December 28, 1981, without a hearing. Writs to the Louisiana Supreme Court were dismissed on July 2, 1982.

This petition for a writ of habeas corpus was filed in the United States District Court on September 24, 1982. It was referred to a magistrate, who, after review of the moving papers and the state court record, recommended on September 12, 1983, that the petition be dismissed. That recommendation was adopted by the district judge, over objection. This appeal followed.

## II.

■ The State concedes that the trial court's charge on intent, that "the accused is presumed to intend the natural and probable consequences of his voluntary acts, knowingly performed," may have shifted the burden of proof on this issue to Johnson, in violation of his due process rights under the rule subsequently set forth in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), assuming, *arguendo*, that *Sandstrom* should be given retroactive application. However, trial counsel for Johnson did not object contemporaneously to the instruction as required by the rules of Louisiana procedure. La. Code Crim.P. art. 841; *see State v. Henry*, 449 So.2d 486, 488 (La.1984) (objection to faulty jury instructions must be made when instructions given). Therefore, unless Johnson can show (1) "cause" for failing to object to the instruction, and (2) "prejudice" by the unconstitutional instruction, he is barred from raising the issue here because his "contentions of federal law ... were *not* resolved on the merits in the state proceeding due to [petitioner's] failure to raise them there as required by

state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2507, 53 L.Ed.2d 594 (1977);[2] *see also Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984). Counsel has "cause" for failing to raise an issue when there is no "reasonable basis" for his position in the law: "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." *Id.*

Although *Sandstrom* was decided shortly after the jury instructions at issue here were given, it can hardly be said that the claim in *Sandstrom* was "novel." *Sandstrom* itself was an entirely foreseeable extension of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); and *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). Moreover, as the Supreme Court noted in *Sandstrom*, three federal circuit courts of appeal and two state appeals courts had determined the instruction to be flawed long before Johnson's conviction. 442 U.S. at 514 n. 3, 99 S.Ct. at 2454 n. 3. The Fifth Circuit, sitting en banc, decided two years before Johnson's trial that nearly identical instructions in federal criminal cases violated due process. *United States v. Chiantese*, 560 F.2d 1244, 1255 (5th Cir.1977) (en banc). *Chiantese* itself, as Chief Judge Brown noted, followed "years and years of pleading, preaching and begging District Judges" to abandon intent-shifting instructions. *Id.* at 1256 (Brown, C.J., concurring). In an analogous case that should have alerted counsel practicing in Louisiana that criminal jury instructions that establish presumptions might be flawed, the United States District Court for the Western District of Louisiana determined in a habeas corpus proceeding in 1978 that a

**2.** The record is unclear whether this issue was presented to the Louisiana Supreme Court on direct appeal. The issue was, however, raised in the state habeas proceeding, and Johnson admits that the state habeas court refused to

consider the merits of the *Sandstrom* claim due to the procedural bar of article 841. *See generally Rault v. Louisiana*, 772 F.2d 117, 133–34 n. 29 (5th Cir.1985); *Stokes v. Procunier*, 744 F.2d 475, 480 (5th Cir.1984).

jury instruction based on Louisiana's negligent homicide statute violated due process rights under *Winship,* because it created an unconstitutional presumption that violation of a safety statute constituted criminal negligence. *Hammontree v. Phelps,* 462 F.Supp. 366, 369 (W.D.La.1978), *aff'd as modified,* 605 F.2d 1371 (5th Cir.1979). Further, commentators writing in Louisiana legal periodicals expressly characterized Louisiana's intent instructions as unconstitutional following *Mullaney.* Comment, *Presumptions in the Criminal Law of Louisiana,* 52 Tul.L.Rev. 793, 807–08 (1978); Note, *The Validity of Criminal Presumptions in Louisiana,* 37 La.L.Rev. 1155 (1977). Finally, if more be needed, Devitt and Blackmar described intent-shifting instructions as "clearly erroneous" in their 1977 edition of *Federal Jury Practice and Instructions* 405 (3d ed. 1977).

For all these reasons, Johnson's claim that the objection to the jury instructions was so novel in April 1979 as to excuse his failure to object contemporaneously is rejected. Even if *Sandstrom* should be construed to apply retroactively, Johnson is barred from raising the issue of its violation in this forum because he did not object to the instruction when it was given, he has

not demonstrated cause to excuse that failure, and state reviewing courts did not reach the merits of the issue. Therefore, this Court cannot address whether the instruction violated Johnson's due process rights.

Because Johnson has not demonstrated that his counsel had cause for failing to object to the improper instruction, we need not address whether Johnson has established "prejudice," as that term is used in the context of *Wainwright v. Sykes.*[3] *See Stokes v. Procunier,* 744 F.2d 475, 480 (5th Cir.1984); *see generally Preston v. Maggio,* 741 F.2d 99, 101 (5th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985). Further, because we do not determine whether constitutional error was committed, we need not consider the state's contention that the instruction, if erroneous, constituted harmless error.[4]

## III.

■ As an alternate ground of relief, Johnson claims that he was denied the right to effective assistance of counsel guaranteed by the sixth amendment. The petition raises numerous alleged shortcomings by trial counsel.[5] However, only trial

---

**3.** We address *infra* the claim that trial counsel was ineffective for failure to object to the instruction. That claim requires an examination of whether Johnson was "prejudiced" by counsel's failure to object in the context of sixth amendment analysis set forth in *Washington v. Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Prejudice" for the purpose of the due process analysis of *Wainwright v. Sykes* "has not been defined with any precision either by the Supreme Court or by this Circuit." *Preston v. Maggio,* 741 F.2d 99, 101 (5th Cir. 1984), *cert. denied,* — U.S. —, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985). We need not attempt to define the term for the purpose of *Sykes* analysis here.

**4.** The harmless error doctrine of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), may be *per se* inapplicable to a *Sandstrom* error. *Hammontree v. Phelps,* 605 F.2d 1371, 1380 (5th Cir.1979); *contra, Garland v. Maggio,* 717 F.2d 199, 203 (5th Cir.1983) (applying *Chapman* harmless error test to jury instructions that violated *Sandstrom* ). This issue has divided the Supreme Court, *Connecticut v. Johnson,* 460 U.S. 73, 86–87, 103 S.Ct. 969, 977–978, 74 L.Ed.2d 823 (1983) (plurality opinion of

Blackmun, J.). *id.* at 97–98, 103 S.Ct. at 983. (Powell, J., dissenting), and other circuits, *Engle v. Koehler,* 707 F.2d 241, 246 (6th Cir.1983) (prejudicial effect of *Sandstrom* error is function of defense asserted at trial), *aff'd by an equally divided court,* 466 U.S. 1, 104 S.Ct. 1673, 80 L.Ed.2d 1 (1984); *Davis v. Kemp,* 752 F.2d 1515, 1520–21 (11th Cir.) (en banc) (*Sandstrom* error harmless if evidence of defendant's guilt is overwhelming or if instruction applied to element of crime not at issue at trial), *cert. denied,* — U.S. —, 105 S.Ct. 2689, 86 L.Ed.2d 707 (1985); *id.* at 1527 (Johnson, J., dissenting) (*Johnson* casts "serious doubt on whether the doctrine of harmless error can be applied to the shifting of a presumption which is so integral to the concept of a fair trial"). The Supreme Court in a recent case construing *Sandstrom, Francis v. Franklin,* — U.S. —, 105 S.Ct. 1965, 1977, 85 L.Ed.2d 344 (1985), did not resolve the issue.

**5.** Johnson's contentions include: (1) failure to cross-examine adequately prosecution witnesses; (2) insufficient pretrial investigation; (3) failure to request instructions specifically addressing the alibi defense; (4) failure to object to the qualification of Jimmy Jr. as a witness;

counsel's failure to object to the intent-shifting jury charge requires extended discussion.

The sixth amendment guarantees a criminal defendant reasonably effective assistance by counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980); *Washington v. Watkins,* 655 F.2d 1346, 1354 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). The Supreme Court in *Washington v. Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), set out a two-part test to determine whether post-conviction relief should be granted on the ground that trial counsel was ineffective: (1) the defendant must show that counsel's performance was deficient, and (2) the defendant must show that the deficient performance prejudiced the defense. *See United States v. Fuller,* 769 F.2d 1095, 1097 (5th Cir.1985). In order to satisfy the first prong of the test, the petitioner must show that counsel's acts "fell beneath an objective standard of reasonable professional assistance." *Stokes,* 744 F.2d at 483. The second prong is satisfied by a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 104 S.Ct. at 2068. An insufficient showing of prejudice leads to rejection of the claim "without inquiry into the adequacy of counsel's performance." *Fuller,* 769 F.2d at 1097.

Cases examining whether a *Sandstrom* error may be harmless for due process analysis are instructive in our consideration of whether there is a reasonable probability that the result of the trial would have been different if an objection had been made. If an error is shown to be harmless, then the error cannot satisfy the prejudice prong of *Strickland. Garland v. Maggio,* 717 F.2d 199, 207 (5th Cir.1983). The plurality in

*Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), addressed whether an erroneous intent-shifting instruction might ever constitute "harmless error." It concluded that, in rare situations, error might be harmless if it did not play "any role in the jury's verdict" because the facts and circumstances conclusively established intent. *Id.* at 87, 103 S.Ct. at 977. The plurality noted that "[i]n presenting a defense such as alibi, insanity, or self-defense, a defendant may in some cases admit that the act alleged by the prosecution was intentional, thereby sufficiently reducing the likelihood that the jury applied the erroneous instructions as to permit the appellate court to consider the error harmless." *Id. See also Garland,* 717 F.2d at 203–04 (corrupting effect of *Sandstrom* violation depends on nature of defense; where defense is non-participation, intent-shifting instruction may be harmless beyond reasonable doubt). In this case, we do not determine whether the flawed instruction played "any role" in the verdict, as we would in a harmless error analysis. Instead, we must determine whether there is a reasonable probability that the result would have been different if counsel had objected, to the extent that confidence in the outcome is undermined.

Following a review of the entire record, it is clear that Johnson has failed to show a reasonable probability that the result of the trial would have been different if counsel had objected to the charge on intent. The controverted issue in the case was whether Johnson was present in the Allen home and shot the weapon that killed Estella Allen and wounded Jimmy Jr. There was evidence sufficient to permit the jury to convict but there was also evidence that, if found credible, might have warranted a different result. Once the jury decided to accept the testimony that placed Johnson in the Allen home and identified him as the person who fired the weapon, the jury could not logically have concluded that he fired the weapon without intent at least to

and (5) failure to request results of a "neutron activation analysis" that might have showed that Johnson did not fire a gun on June 28, 1978. A

review of the record indicates that none of these contentions has any merit.

inflict a grave bodily injury, either deliberately or in the heat of passion. Jimmy Jr. testified that Johnson and Estella were involved in a heated argument shortly before the shooting, and that Johnson threatened to shoot him when Estella told the boy to call for help. Estella then was shot through the neck at a distance of three feet. The assailant then walked to another part of the house and shot Jimmy Jr. while he was lying in bed, apparently in order to eliminate the only witness to the crime. The assailant then fled from the house. We see no reasonable probability that a jury which had rejected the testimony of Johnson and his wife, and which had accepted the testimony of Jimmy Jr., could have decided that Johnson committed homicide but lacked specific intent. Johnson's intent simply was not a contested issue. Defense counsel did not argue that the prosecution failed to prove that both shootings were intentional. Johnson raised an alibi defense through his testimony and that of his wife; he claimed that he was asleep in another part of Shreveport at the time of the killing. He did not contend that the shooting was an accident, that he fired the gun but only intended to scare the victims, or that he was intoxicated. In light of the concentration of the defense on the alibi claim, it is not reasonably probable that the result would have been different if the objection had been made.

Under the circumstances of this case, where intent was not a contested issue, the jury was twice instructed on specific intent as to both second-degree murder and voluntary manslaughter, and, having found Johnson was present and fired a weapon, no rational juror could have found that he did so without specific intent, Johnson has not shown that counsel's failure to object to the intent-shifting instruction constituted ineffective assistance of counsel. The trial was not fundamentally unfair, and there is no reasonable probability that the result of the trial would have been different if counsel had objected.

## IV.

The trial judge allowed testimony over objection from Clara Bolden and Ann Thomas regarding conversations that they had with Mrs. Allen before her death. Thomas testified that "I was glad she decided to go back to Jimmy Sr.," and Bolden stated she was "happy" the Allens planned to get back together. The Louisiana Supreme Court on direct appeal determined that the testimony was hearsay under state law, but that its admission was not unduly prejudicial. Johnson urges a review of the Louisiana court's ruling.

■ A writ of habeas corpus may be granted under § 2254 only if the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be used to remedy violations of state rights. *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963); *United States ex rel. Hoover v. Franzen*, 669 F.2d 433, 436 (7th Cir.1982); *Cronnon v. Alabama*, 587 F.2d 246, 250 (5th Cir.), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979). As a general rule, admissibility of evidence is a matter of state law, and only a contention that the admission of the evidence rendered the trial fundamentally unfair or violated a specific constitutional right will be considered in a federal collateral proceeding. *Meyer v. Estelle*, 621 F.2d 769, 771 (5th Cir.1980).

As to whether admission of the testimony rendered his trial fundamentally unfair, "[a]n unfair trial has been characterized as one that has been 'largely robbed of dignity due a rational process.'" *Menzies v. Procunier*, 743 F.2d 281, 288 (5th Cir.1984) (quoting *Houston v. Estelle*, 569 F.2d 372, 383 (5th Cir.1978)). Even assuming that the admission of Thomas' and Bolden's testimony was erroneous, "the mere erroneous admission of prejudicial testimony does not, in itself, justify federal habeas relief unless it is 'material in the sense of a crucial, critical, highly significant factor,' in the context of the entire trial." *Menzies*, 743 F.2d at 288 (quoting *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir.1983)).

A review of the record demonstrates that this testimony was in no sense crucial to the prosecution. Practically identical testimony concerning Estella's plan to return to her husband was introduced through direct testimony and cross-examination of the husband, Jimmy Johnson, Sr. Therefore, the evidence was merely cumulative in nature, so that it was not "crucial." The evidence did not render Johnson's trial fundamentally unfair.

The only specific constitutional right that Johnson asserts was violated is the confrontation clause of the sixth amendment, made applicable to the states through the fourteenth amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The "mission of the confrontation clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970) (quoting *California v. Green*, 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970)). Although the confrontation clause and the hearsay rule are related, *Ohio v. Roberts*, 448 U.S. 56, 62, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980), "the sixth amendment right to confrontation does not perforce preclude the admission of any hearsay testimony," *Spears v. Circuit Court, Ninth Judicial District*, 517 F.2d 360, 365 (5th Cir.1975) (citing *Dutton*, 400 U.S. at 83, 91 S.Ct. at 216). In order to determine whether the admission of hearsay evidence violates the confrontation clause, four factors must be considered: (1) was the hearsay evidence "crucial" or "devastating;" (2) did prosecutors misuse a confession or otherwise engage in misconduct; (3) was a joint trial or the wholesale denial of cross-examination involved; and (4) was the most important prosecution witness, as well as other prosecution witnesses, available for cross-examination. *Dutton*, 400 U.S. at 87, 91 S.Ct. at 219; *Spears*, 517 F.2d at 365–66. Further, the hearsay evidence should be examined for "indicia of reliability." *Dutton*, 400 U.S. at 89, 91 S.Ct. at 220; *Favre v. Henderson*, 464 F.2d 359, 363–64 (5th Cir.), cert. denied, 409 U.S. 942, 93 S.Ct. 235, 34 L.Ed.2d 193 (1972).

We will assume for the purpose of this analysis that the testimony in question was hearsay. Of the factors set forth in *Spears*, (2) and (3) are clearly inapplicable to this case. An application of factors (1) and (4) weigh strongly against Johnson's position. It is inconceivable that the testimony of Bolden and Thomas was in any sense "devastating" to Johnson. The only "devastating" testimony was that of Jimmy Allen, Jr., the sole eyewitness to the crimes. He was extensively cross-examined, as were numerous other prosecution witnesses. *Cf. Spears*, 517 F.2d at 366. Moreover, the reliability of the hearsay evidence of Thomas and Bolden is buttressed by the testimony of Jimmy Allen, Sr., that "we had planned to get back together." On cross-examination by defense counsel, Jimmy Sr. testified that shortly before her slaying, Estella and Jimmy Sr. planned to "reconcile." After an examination of the entire record, in no sense was the hearsay evidence crucial, devastating or unreliable. Therefore, its admission did not violate the confrontation clause.

### V.

Johnson raises several other points of error, none of which has any substance. He claims that the trial court erred in admitting the "incompetent" testimony of Jimmy Allen, Jr., because the witness "did not appreciate his duty to tell the truth." Defense counsel did not object to the qualification of Jimmy Jr. as a witness. Even assuming this allegation states a constitutional claim reviewable in a § 2254 proceeding, the claim is not properly before us in light of counsel's failure to object to the testimony. *See Wainwright v. Sykes*, 433 U.S. at 87, 97 S.Ct. at 2506. Johnson has not attempted to show cause for failure to object to Jimmy Jr.'s qualification or prejudice by his qualification. Therefore, we cannot address whether a constitutional

right of Johnson's was violated. In any event, in light of the careful voir dire of Jimmy Allen, Jr., in which the prosecutor, defense counsel, and trial judge examined his ability to understand, recall and narrate his impression of the shootings, it would be difficult to conclude that the trial court's decision rendered the trial fundamentally unfair. Whether Jimmy Allen, Jr.'s testimony was so internally inconsistent as a matter of fact that it was not credible, as Johnson further argues, is not an issue that this Court may consider. *Maggio v. Fulford,* 462 U.S. 111, 113, 103 S.Ct. 2261, 2262, 76 L.Ed.2d 794 (1983); *see United States ex rel. Petillo v. New Jersey,* 562 F.2d 903, 907 (3d Cir.1977); *Mapp v. Clement,* 451 F.Supp. 505, 510 (S.D.N.Y.), *aff'd without opinion,* 591 F.2d 1330 (2d Cir. 1978), *cert. denied,* 440 U.S. 948, 99 S.Ct. 1428, 59 L.Ed.2d 637 (1979).

■ Johnson claims that the jury instruction on the alibi defense and the possibility of mistaken identification was "not sufficient[ ]." Even assuming that this raises a constitutional issue, *see Henderson v. Kibbe,* 431 U.S. 145, 155, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977), there is no indication in the record that the defense objected to the charge as given. Therefore, under the doctrine of *Wainwright v. Sykes,* we are barred from addressing the merits of the issue. Furthermore, it may be noted that the trial court instructed the jury that "[i]f the circumstances of the identification are not convincing beyond a reasonable doubt you must find the defendant not guilty." It is inconceivable that the refusal to further charge the jury, as defendant requested, that "if ... you have a reasonable doubt whether the defendant was present at the time and place of the alleged offenses, you must find him not guilty," rendered the trial fundamentally unfair or violated a specific constitutional right. Indeed, the requested charge would have added nearly nothing to the charge as given.

## VI.

For the reasons set forth above, the Order of the District Court dismissing the petition for a writ of habeas corpus is AFFIRMED.