**Milton Eugene CUPIT, Petitioner–Appellee,**

v.

**John P. WHITLEY, Warden, Louisiana State Penitentiary, Respondent–Appellant.**

**No. 93–4179.**

United States Court of Appeals, Fifth Circuit.

Aug. 16, 1994.

Rehearing Denied Sept. 12, 1994.

William R. Coenen, Jr., Dist. Atty., Terry A. Doughty, Asst. Dist. Atty., Rayville, for respondent-appellant.

Prof. Kenneth J. Servay, New Orleans, LA (court-appointed), for petitioner-appellee.

Before REYNALDO G. GARZA, DeMOSS, and PARKER [1], Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

This is an appeal from a judgment of the district court granting a conditional writ of habeas corpus to Milton Eugene Cupit (Cupit) in a civil writ of habeas corpus proceeding. The jurisdictional basis for this appeal

[1]. Judge Parker participated by designation in the oral argument of this case as a United States District Judge for the Eastern District of Texas. Since that time he has been appointed as a Fifth Circuit Judge.

is 28 U.S.C. § 2254. More specifically, Respondent–Appellant John P. Whitley (Whitley)—the Warden of the Louisiana State Penitentiary—appeals on behalf of the State of Louisiana from a final judgment of the United States District Court for the Western District of Louisiana (adopting the reasoning and recommendation of the United States Magistrate Judge) granting Cupit's petition for a writ of habeas corpus under 28 U.S.C. § 2254.

We vacate the judgment of the district court and remand with directions to dismiss the writ.

## I. BACKGROUND

On October 9, 1993, the body of James Allen Halley was found on the bank of the LaFourche Canal in Richland Parish, Louisiana. Halley had suffered three gunshot wounds from a .12 gauge shotgun discharged at close range. Before his death, Halley had been scheduled to appear for his trial (on October 10, 1983) on a charge of attempted aggravated arson. In that charge, it was alleged that Halley had been discovered behind the Foxfire Lounge in Monroe, Louisiana, on June 21, 1983, by the proprietor of the establishment, Carl Gwin, applying gasoline to the walls of the lounge in preparation to set the place on fire.

Cupit and Halley had spent a great deal of time together. Cupit was questioned about Halley's death in October and November of 1983—at which times he professed to know nothing about Halley's death. On December 3 and 4, 1983, however, Cupit gave law enforcement officials taped statements concerning Halley's death. In his December statements, Cupit implicated Jeffrey Wayne Mann as Halley's killer, stating that he was with Mann when Mann killed Halley and that Mann killed Halley because Halley was having an affair with Mann's wife. In these statements, Cupit said that he and Mann left the scene together, and that together they had hid the shotgun Mann used to kill Halley.

Cupit was arrested and charged in Richland Parish, Louisiana, with first degree murder and with conspiracy to commit the first degree murder of James Halley. He was ultimately charged with a second degree murder count.

The Louisiana trial court held a pretrial hearing outside the presence of the jury prior to the introduction of the particular evidence about which Cupit complains. The purpose of this pretrial hearing was to consider the admissibility in evidence of testimony regarding Cupit's purported involvement in the attempted aggravated arson of the Foxfire Lounge for which Halley was to be tried at the time of his murder (on the prosecution's theory that "silencing" Halley about Cupit's involvement in the attempted arson was Cupit's motive to kill Halley). In the hearing: Carl Gwin, Bobby Nobles, Officer Gary Brooks and Judy Scott all testified as to Halley's statements to them prior to his death. All of this testimony, to which Cupit's counsel objected, was ruled admissible by the state trial judge.

Cupit was convicted on the second degree murder charge on June 7, 1986. He was subsequently sentenced to life in prison without parole, probation, or suspension of sentence.

Cupit appealed his conviction to the Louisiana Second Circuit Court of Appeals, alleging seven assignments of error—including the claim central to this appeal, that a number of witnesses were improperly permitted to give hearsay testimony to prove that Cupit had a motive for killing Halley. The state appellate court affirmed his conviction on June 10, 1987, 508 S.2d 996. Cupit sought a writ of certiorari from the Louisiana Supreme Court, which was denied on November 20, 1987, 514 So.2d 1174. He filed an application for collateral, post-conviction relief in the Louisiana Fifth Judicial District, Parish of Richland, on February 20, 1990. That application was dismissed on April 5, 1990. His application for a writ of review was then denied by the Louisiana Second Circuit Court of Appeals, whereupon he filed an application for writ of review with the Louisiana Supreme Court, which was denied on September 20, 1991.

Cupit then filed this petition for a writ of habeas corpus under the federal statutory regime, 28 U.S.C. § 2254, in the United

States District Court for the Western District of Louisiana—on February 24, 1992. The magistrate court assigned to Cupit's case by the district court issued a Report and Recommendation on September 17, 1992, finding merit in Cupit's third (and only his third) habeas issue—in which Cupit argued his constitutional rights had been violated during his trial by the state trial court's admission of hearsay evidence. The magistrate court recommended that Cupit be granted a conditional writ of habeas corpus, ordering his discharge from custody within 60 days unless the state commenced proceedings to retry Cupit within that period.

The parties filed objections to the Report and Recommendation. But on February 4, 1993, the district court adopted the Report and Recommendation in full, which resulted in the district court's decision that Cupit's trial may have been adversely impacted by the erroneously admitted hearsay testimony, and that therefore Cupit's petition should be granted.

Whitley filed a timely notice of appeal to this Court. And the district court granted Whitley's motion to stay the judgment on February 26, 1993.

## II. ANALYSIS

### A. *Procedural Default and Exhaustion Requirement Issues*

[■] Whitley argues that the doctrines of procedural bar and exhaustion should preclude our consideration of Cupit's hearsay arguments. He argues in particular that Cupit failed to raise the hearsay issue through his appropriate, state remedial avenues. However, we hold that Whitley's procedural default and exhaustion arguments are without merit, for the following reasons. First, the state record belies Whitley's claim in this respect (in that Cupit did indeed adequately raise his hearsay arguments through his state court proceedings). Second, Whitley waived his right to object to Cupit's hearsay claims on these doctrinal grounds, Whitley failed to so object in his answer to Cupit's federal petition and/or in argument to the United States Magistrate Judge assigned to the case. Specifically, Cupit clearly raised this issue in his federal petition. While Whitley was ordered by the Magistrate Judge to file an answer and memorandum specifically addressing the claims raised by Cupit in his petition, Whitley answered Cupit's hearsay argument in but a cursory and non-responsive manner. In his answer, Whitley did not object to Cupit's claims on procedural default grounds. Rather, Respondent simply admitted that Petitioner "has exhausted his state remedies."[2] Indeed, in the memorandum attached to his answer, without objecting on procedural default grounds, Respondent actually attempted to address the merits of Petitioner's argument in this respect.[3] Not until after the magistrate court issued its Report and Recommendation to the district court addressing Cupit's arguments and finding them meritorious did Whitley object on procedural default grounds.[4] By waiting until after the magistrate court had issued its findings and recommendations, and by admitting that Petitioner had exhausted his state remedies on all issues raised in his federal petition, Respondent has waived procedural default and exhaustion doctrine objections.[5]

---

2. Federal District Court Record, at 82.

3. *Id.*, at 85–86.

4. *Id.*, at 140–144.

5. *See, e.g., Long v. McCotter*, 792 F.2d 1338, 1345 (5th Cir.1986) ("we ordinarily do not consider issues that have not been presented to the court of first instance") (citations omitted). *See also e.g., Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990–991 (1st Cir.1988) (explaining that a party "has a duty to put its best foot forward" before the Magistrate Judge—i.e., "to spell out its arguments squarely and distinctly"—and, accordingly, that a party's entitlement to de novo review before the district court upon filing objections to the Report and Recommendation of the Magistrate Judge does not entitle it to raise issues at that stage that were not adequately presented to the Magistrate Judge); *Anna Ready Mix, Inc. v. N.E. Pierson Construction Co.*, 747 F.Supp. 1299, 1302–1303 (S.D.Ill.1990) (thoroughly analyzing the federal Magistrate Judge Act, 28 U.S.C. § 631, *et seq.*, and discerning therefrom that when a matter is assigned to a Magistrate Judge, Congress intended that the Magistrate Judge hear all arguments of the parties and take all evidence; and, accordingly, holding that while the Act provides for de novo review by the dis-

**B. *The Assumed Trial Error of Wrongfully Admitted Hearsay Evidence***

█2] What is and is not hearsay evidence in a state trial is governed by the relevant state law on evidence. A state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair (in which case sustaining the conviction would violate Petitioner's Fourteenth Amendment right to due process).[6] Cupit alleges that the state trial court in his second degree murder case erred by admitting inadmissible hearsay evidence, and that this error both violated Cupit's specific rights under the Sixth Amendment's confrontation clause and rendered his trial fundamentally unfair—which entitle him to a writ of habeas corpus. Cupit relies upon outdated law, however, predating the now-controlling United States Supreme Court decision of April 21, 1993, in *Brecht v. Abrahamson.*[7]

The district court adopted the reasoning and conclusions contained in the Report and Recommendation of the magistrate court to whom Cupit's petition had been assigned for the purpose of conducting any necessary hearings and submitting proposed findings of fact and conclusions of law. But the Report and Recommendation adopted by the district court was itself based upon pre-*Brecht* harmless error analysis.

Following *Brecht,* we hold upon de novo review of the record: even assuming that the evidence about which Cupit complains was wrongfully admitted hearsay evidence under the law of Louisiana, and even assuming that the state trial court's erroneous admission of such hearsay evidence violated Cupit's Sixth Amendment rights, this evidence did not have much probative force in Cupit's second degree murder trial and conviction. It did not have enough of an effect upon Cupit's conviction to support the habeas relief Cupit seeks.

**1. Regarding Cupit's Sixth Amendment Claim in Particular**

█3] Even assuming the evidence about which Cupit complains was wrongfully admitted hearsay under Louisiana evidence law, we regard Cupit's Sixth Amendment claims to be empty.

The Sixth Amendment—made applicable to the states through the Fourteenth Amendment—provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ".[8] Although the confrontation clause and the hearsay rule are related, the Sixth Amendment right to confrontation does not *perforce* preclude the admission of any hearsay testimony.[9] As the Supreme Court has explained, the "mission of the confrontation clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior state-

---

trict court if timely objections are filed, it does not allow the parties to raise at the district court stage new evidence, argument, and issues that were not presented to the Magistrate Judge— "absent compelling reasons").

**6.** *See Pemberton v. Collins,* 991 F.2d 1218, 1226 (5th Cir.) (citing *Johnson v. Blackburn,* 778 F.2d 1044, 1050 (5th Cir.1985)), *cert. denied,* —— U.S. ——, 114 S.Ct. 637, 126 L.Ed.2d 596 (1993).

**7.** *Brecht,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *Compare* Supplemental Brief of Appointed Counsel in Support of Appellee, Milton E. Cupit, at 19–20 ("Where the state court is found to have violated a defendant's constitutional rights, the burden shifts to the party who has benefitted by the violation (here, the respondent) to prove that the 'error was harmless beyond a reasonable doubt.' ") (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct.

824, 828, 17 L.Ed.2d 705 (1967)), *with Brecht v. Abrahamson,* —— U.S. ——, —— —— ——, 113 S.Ct. 1710, 1721–1722, 123 L.Ed.2d 353 (1993) ("overturning final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under *Chapman* undermines the States' interest in finality and infringes upon their sovereignty over criminal matters. * * * The imbalance of the costs and benefits of applying the *Chapman* harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error.") (holding the standard in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), to be applicable on habeas review).

**8.** U.S. Const. amend. VI.

**9.** *Johnson v. Blackburn,* 778 F.2d 1044, 1051 (5th Cir.1985).

ment.' " [10] In order to determine whether the wrongful admission of hearsay evidence violates the confrontation clause, courts must assess the admission of the evidence in light of a host of considerations—in order to determine whether the evidence was not just inadmissible, but also whether it was *material* (i.e., whether it was a crucial, critical, or highly significant factor in the framework of the whole trial).[11]

Specifically, in order to determine whether the admission of hearsay violates the confrontation clause, five factors must be considered:

(1) whether the hearsay evidence was "crucial" or "devastating;"

(2) whether prosecutors misused a confession or otherwise engaged in misconduct;

(3) whether a joint trial or the wholesale denial of cross-examination was involved;

(4) whether the most important prosecution witness, as well as other prosecution witnesses, was available for cross-examination;

and

(5) the degree to which the hearsay evidence is supported by "indicia of [its] reliability." [12]

The prosecutors in Cupit's trial did not misuse a confession or otherwise engage in significant misconduct. The third consideration is wholly inapplicable to this case. The fourth consideration weighs strongly against Cupit's position. Indeed, the prosecution's most important witness was Cupit himself—in the form of his own statements given to law enforcement officers. These statements,

in conjunction with Cupit's *actions*, constituted the most devastating evidence against him. Finally, fifth, the reliability of the hearsay testimony that was supported by Cupit's own actions toward Halley, both before and after Halley's death.

Viewing the evidence about which Cupit complains through the above prism of considerations, we are of the view that the hearsay evidence in this case was not "crucial, devastating, or unreliable. Therefore, its admission did not violate the confrontation clause." [13] Furthermore, even assuming that the evidence admitted against Cupit *did* violate his Sixth Amendment rights, such constitutional trial error was "harmless," affording Cupit no grounds for habeas relief.

2. Regarding *Brecht,* "Harmless Error" and This Case, in Particular

In *Brecht v. Abrahamson,* the Supreme Court reaffirmed its distinction between two broad, primary "kinds" of constitutional violations that may occur in a state criminal proceeding: "structural errors"—which affect the most basic elements of a criminal trial (*e.g.,* a biased judge or the denial of counsel to the defendant); and "trial errors"—mistakes made during the course of the defendant's trial that are deemed less significant than "structural errors." [14] The Court also clarified that a different "harmless error" standard is applicable to the federal court habeas review of a case than the one applicable to a federal court's direct review of a case:

In *Chapman v. California* [ ] we held that the standard for determining whether

---

**10.** *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970) (quoting *California v. Green,* 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970)).

**11.** *See e.g., Johnson v. Blackburn, supra* note 9, at 1051.

**12.** *Id.* at 1051 (quoting *Dutton, supra* note 10, 400 U.S. at 89, 91 S.Ct. at 220).

**13.** *Johnson v. Blackburn, supra* note 9, at 1051.

**14.** *Brecht v. Abrahamson,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See also Arizona v. Fulminante,* 499 U.S. 279, 306–311,

111 S.Ct. 1246, 1263–1265, 113 L.Ed.2d 302 (1991) (holding that harmless error analysis applies to the wrongful admission at trial of coerced confessions; explaining that the essential feature of "trial errors" is that they occur during the presentation of the case to the jury, "and may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless"; and explaining further that "structural errors" are not subject to this harmless error analysis, primarily because "[t]he entire conduct of the trial from beginning to end is obviously affected" by them—so, the trial cannot then reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair).

a conviction must be set aside because of federal constitutional error is whether the error "was harmless beyond a reasonable doubt." In this case we must decide whether the *Chapman* harmless-error standard applies in determining whether the prosecution's use for impeachment purposes of petitioner's post-*Miranda* [ ] silence, in violation of due process, ... entitles petitioner to habeas corpus relief. We hold that it does not. Instead, the standard for determining whether habeas relief must be granted is whether the ... error "had substantial and injurious effect or influence in determining the jury's verdict." [15]

In the habeas context, then, the first ("structural") type of violation vitiates the proceedings; it cannot be considered "harmless error." But the second ("trial") type of violation is not necessarily fatal to the proceedings; it may, in light of a de novo review of the whole record, be considered "harmless error"—in that it can be found not to have caused actual prejudice to the petitioner. There may also be "hybrid," or "unusual" cases that do not fit so neatly into one of these two primary categories of error. In *Brecht*'s footnote 9, the Court noted the possibility of "an unusual case" in which there occurs "a deliberate and especially

egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct" that might so "infect the integrity of the proceedings as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." [16]

█] The assumed wrongful and unconstitutional admissions of hearsay evidence against Cupit are neither so unusual nor egregious, either in isolation or as a part of a pattern of error, as to constitute structural error or "*Brecht* Footnote Nine," "hybrid" error. These assumed wrongful evidentiary admissions are but "classic trial errors." [17] Still, when reviewing "classic trial errors," a 28 U.S.C. § 2254 federal habeas court must heed the caution contained in *Kotteakos* itself:

The [court's habeas, "harmless error"] inquiry cannot be merely whether there was enough [evidence] to support the [conviction] result, apart from the phase affected by the error. It is rather, even so, whether the error itself *had substantial influence*. If so, *or* if one is left in *grave doubt*, the conviction cannot stand. [18]

Our task in a case like this, then, is to determine—based upon careful review of the record in this case—whether the petitioner has successfully established in our minds

---

**15.** *Brecht, supra* note 14, — U.S. at — — —, 113 S.Ct. at 1713–1714 (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); and *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)) (other citations omitted).

**16.** *Brecht, supra* note 14, — U.S. at — n. 9, 113 S.Ct. at 1722 n. 9 (citing *Greer v. Miller*, 483 U.S. 756, 769, 107 S.Ct. 3102, 3110, 97 L.Ed.2d 618 (1987) (Stevens, J., concurring in judgment)). *See also e.g., Hardnett v. Marshall*, 25 F.3d 875, 879 (9th Cir.1994) ("This hybrid, Footnote Nine error as we denominate it, is thus assimilated to structural error and declared to be incapable of redemption by actual prejudice analysis. The integrity of the trial, having been destroyed, cannot be reconstituted by the appellate court.").

**17.** *Compare Arizona v. Fulminante, supra* note 14, 499 U.S. at 309, 111 S.Ct. at 1265 (stating that the erroneous introduction of a coerced confession by the trial court is "a classic trial error"); *id.,* 499 U.S. at 307, 111 S.Ct. at 1264 (explaining that by classifying most constitutional

errors—including coerced confessions—as "trial errors," the Court remains faithful to the view that harmless error is necessary to preserve the " '[p]rinciple that the central purpose of a criminal trial is to decide the factual question of a defendant's guilt or innocence and promote public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' ") (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); other citations omitted).

**18.** *Kotteakos, supra* note 15, 328 U.S. at 765, 66 S.Ct. at 1248 (emphasis added). *See also Brecht, supra* note 14, — U.S. at —, 113 S.Ct. at 1724 (Stevens, J., concurring) (emphasizing that in order to apply the *Kotteakos* standard properly, the § 2254 federal habeas court must make a de novo examination of the entire trial record, *so as* to fully consider *all* the ways in which the complained-of error could have infected the course of the petitioner's trial—as the habeas court must decide *that the error did not influence the jury,* and that the judgment was not substantially *swayed* by the error).

*grave doubt* as to the question of whether the assumed wrongfully admitted hearsay influenced the conviction.[19]

Cupit has failed to establish such doubt. Specifically, the determination of whether the erroneous admission of such evidence is "harmless" depends upon a host of factors, all readily accessible to a reviewing court:

(1) the importance of the witness's testimony in the prosecution's case;

(2) whether the testimony was cumulative;

(3) the presence or absence of evidence corroborating or contradicting the testimony;

and

(4) the overall strength of the prosecution's case against the defendant.[20]

Of these, the strength of the prosecution's case is probably the single most important factor in determining whether the error was harmless.[21] The record reveals that the prosecution's case against Cupit for second degree murder was substantial. As the magistrate court's Report and Recommendation itself recognizes: "[e]ven if the hearsay evidence as to Cupit's motive which was improperly admitted into evidence had been excluded, there would still have been sufficient evidence to support a guilty verdict, if the jury had brought in a guilty verdict without the inadmissible evidence."[22]

The magistrate court (and the district court in turn) nonetheless felt compelled to grant Cupit's writ petition—because (and only because) the *Chapman* standard compelled that result: "the jury *may* not have rendered the same verdict if it had not heard the inadmissible evidence."[23] This "maybe" finding is a good degree less than the establishment by Cupit of "grave doubts" that the inadmissible hearsay evidence actually prejudiced or had a substantial and injurious effect or influence upon the jury's guilty verdict against him.[24]

In short, not even the magistrate court harbored the "grave doubts" as to the effect or influence of the hearsay evidence upon the Cupit guilty verdict that is required under *Brecht.* Nor do we. The probative value of the challenged statements is quite minimal compared to the wealth of other, substantial and corroborating non-hearsay evidence introduced against Cupit at his trial.

#### a. The Applicable State Law

"Motive" was not an element of proof under the Louisiana second degree murder law. On the day the victim was killed, Louisiana defined second degree murder as the killing of a human being: (1) when the offender has the specific intent to kill or inflict great bodily harm; *or* (2) when the offender is engaged in the perpetration or attempted perpetration of a felony—including aggravat-

19. *See Lowery v. Collins,* 996 F.2d 770, 773 (5th Cir.1993).

20. *See Samuels v. Mann,* 13 F.3d 522, 526 (2d Cir.1993), *petition for cert. filed,* —— U.S.L.W. —— (U.S. June 8, 1994) (No. 93–9479). *See also Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

21. *See e.g., United States v. Castano,* 999 F.2d 615, 618 (2d Cir.1993) (per curiam). *See also* 3A CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 854, at 305 (2d ed. 1982).

22. Report and Recommendation of 9–17–92, Federal District Court Record, 94, 112.

23. *Id.* (emphasis added).

24. *See Brecht, supra* note 14, —— U.S. at —— ——, 113 S.Ct. at 1720–1721 (explaining how, in a § 2254 habeas context, a state judgment is presumptively correct and habeas petitioners therefore may not obtain relief from such a judgment based on *trial error* "unless they can establish that it resulted in 'actual prejudice.'"). *See also Jeffries v. Blodgett,* 5 F.3d 1180, 1190 (9th Cir.1993) (*Brecht* applied to hold that in order to obtain relief, a § 2254 habeas petitioner must show that the alleged trial error "had substantial and injurious effect or influence in determining the jury's verdict.") (quoting *Brecht,* —— U.S. at ——, 113 S.Ct. at 1722, in turn quoting *Kotteakos,.* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994). *See also Castillo v. Stainer,* 997 F.2d 669 (9th Cir.) (applying *Brecht* on appeal to a pre-*Brecht* district court decision—and accordingly holding that given the presumptive correctness of a state judgment, the petitioner had failed to meet his burden of establishing that the trial error resulted in the petitioner's suffering actual prejudice), *cert. denied,* —— U.S. ——, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993).

ed rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery or, simple robbery—even though he has *no* intent to kill or to inflict great bodily harm.[25] The prosecution presented both of these type theories of Cupit's guilt for second degree murder to the Louisiana jury sitting in judgment of Cupit. And the state trial court charged the jury under both theoretical provisions of the state's second degree murder statute. The law of Louisiana also defined "principals" as follows:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.[26]

One convicted of a crime as a principal under this statute must himself be found to have possessed the intent required under the relevant "principal" statute.[27] The jury passing judgment on Cupit was instructed on this law as well.

### b. The Hearsay Evidence Deemed Critical by the District Court

The hearsay evidence the magistrate and district courts determined "may" have been critical to Cupit's conviction was the testimony of Bobby Nobles (Nobles) and Officer Gary Brooks (Brooks). The district court adopted the magistrate court's reasoning and conclusion that:

> [t]he *only* evidence from which the jury could infer that Cupit had a specific intent to kill Halley or to assist in Halley's killing was the evidence that Halley intended to implicate Cupit in the aggravated arson of the Foxfire Lounge when Halley was tried for that crime on October 10, 1983. * * * For that reason, I find that the admission of the just discussed hearsay testimony of Bobby Nobles and Gary Brooks rendered

the trial as a whole "fundamentally unfair", and stands as a ground for granting habeas corpus relief to Cupit.[28]

This analysis and conclusion are mistaken.

The state trial court allowed witnesses Bobby Nobles and Gary Brooks to testify as to the following.

#### i. Nobles' Testimony

Nobles told the jury that he was present at the Foxfire Lounge on the night of Halley's alleged attempted arson of the place. Nobles testified that he and Halley arrived at the Lounge between seven and eight that night. He said that later, he saw Cupit arrive at the Lounge, he saw Halley go over to join Cupit at Cupit's table, and that he saw the two of them then begin talking. He testified that he (Nobles) went over to join them. Then, Nobles stated that he *heard* Cupit and Halley talking about burning down the Lounge, and that he saw Cupit hand Halley some money. Nobles stated that he then saw Halley leave the Lounge, and a little later, that he saw Lounge manager Gwin escorting Halley back into the Lounge. He testified that he saw Gwin go immediately over to Cupit at that point, and that then Gwin and Cupit went into a storage room for a private conversation. Nobles stated that about thirty to thirty-five minutes later, he saw the police arrive and arrest Halley. Also, Nobles testified that during later meetings he had with Halley, Halley *told him* that he intended to "turn state's evidence" at his impending attempted arson trial, but that he was scared about doing so—i.e., impliedly, that he was scared of Cupit.

#### ii. Brooks' Testimony

Officer Brooks, a bomb specialist who talked to Halley the day after the latter's arrest, testified that Halley *told him* that Cupit was involved in the attempted arson, and that he (Halley) was afraid of Cupit.

---

25. *See* LOUISIANA R.S. § 14:30.1.

26. LOUISIANA R.S. § 14:24.

27. *See e.g., State v. Brooks*, 505 So.2d 714, 717 (La.), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).

28. Report and Recommendation of 9–17–92, Federal District Court Record, at *109, 111* (emphasis added).

Brooks testified that Halley *told him* that if he implicated Cupit, "[Cupit will] kill me." [29] And Brooks stated that on a later occasion, Halley again *mentioned* Cupit's name to Brooks in connection with the attempted Foxfire Lounge arson.

c. The Substantial, Non–Hearsay Evidence of Cupit's Guilt, and the Assumed Hearsay's Insignificance Within the Overall Scheme of This Substantial Non–Hearsay Evidence, Specifically

Undoubtedly, the requisite specific intent to kill or to cause Halley great bodily harm that Cupit must have had in order to be found guilty of the second degree murder of Halley can be found in the substantial non-hearsay evidence introduced at Cupit's trial. The law is clear that specific intent can reasonably be found to exist when *circumstances indicate* that the offender actively desires criminal consequences to flow or to follow from his act(s) or failure(s) to act. And even the actions of the defendant *after* a crime can be deemed demonstrative of his or her intent relative to the crime itself.[30]

In this case, non-hearsay evidence was to the effect that Cupit knew Halley was going to trial on the arson charge—i.e., that Cupit exhibited significant nervousness just before Halley's scheduled trial date.

Furthermore, as Cupit's own statements disclose: Cupit drove Halley to an obscure site on a Louisiana backroad. There, Cupit allowed Mann to get a weapon out of Cupit's vehicle. Indeed, Cupit had to exit the vehicle so that Mann could reach the shotgun. Cupit also at least helped Mann by pretending to "look for stash" after Mann asked Cupit to cooperate in this ruse in order to dupe Halley long enough for him to be killed.

Cupit certainly took no action to *prevent* Mann from killing Halley. And, as the Louisiana Second Circuit Court of Appeals recognized, this evidence of Cupit's failure to try to stop Mann from killing Halley or to warn Halley, despite the fact that (according to Cupit's statements) Cupit had been told by Mann that he was going to kill Halley, is indicative of Cupit's own specific intent to aid and abet Mann in the killing. So too are the facts that, far from comforting or assisting Shotgun Victim Halley, Cupit actually continued to assist Mann in covering up the murder—for example, by driving the vehicle back from the scene, by assisting Mann in the hiding of the murder weapon, and by assisting Mann in the hiding of the vehicle that had been used in the killing. Indeed, Cupit disposed of Halley's car keys after the killing (by throwing them into a Bayou)—in what the jury might rationally have considered to be yet another guilt-indicative attempt by Cupit to eliminate evidence of Halley's murder. Further, far from promptly reporting the crime, for *two months* following law enforcement officers' discovery and initiation of investigation into Halley's killing, Cupit maintained that he had no knowledge of Halley's death, that he was not present when Halley was killed, that he did not know who killed Halley, and that he did not kill Halley. Also, an eyewitness testified at trial to having seen Cupit and Mann together, driving near (and away from) the crime scene on the very day the body was found, at approximately the time the body was spotted. From this testimony, in light of the other non-hearsay evidence presented, a reasonable jury could well have inferred that Cupit and Mann were continuing with their cover-up cooperation, checking to see whether Halley's body had been discovered and/or the current discoverable state of his carcass.

In addition to the evidence of Cupit's guilt addressed above, the jury might well have also found incredible Cupit's story that the shotgun used in the killing remained behind a produce stand for two months after the killing and before Cupit showed it to law enforcement officers. The jury might reasonably have deemed this unbelievable and indicative of Cupit's lack of credibility on the subject of Halley's killing *generally*. Indeed, the jury might even have found this story to

---

**29.** State Record, IV, at 886.

**30.** *See generally e.g., State v. Brooks*, 505 So.2d 714, 717 (La.) ("specific intent is a state of mind and, as such, it need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant.") (citing Louisiana R.S. § 15:445), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).

but evidence Cupit's own "planting" of the weapon that *he* had used on Halley, notwithstanding that he was saying he and Mann placed the gun behind the stand after *Mann* killed Halley. The jury had heard testimony from someone who had sold Cupit a shotgun, as well as from someone who said she knew Cupit carried a shotgun behind the seat of the vehicle he customarily operated. Also potentially undermining of Cupit's credibility with the jury was the fact that, when he *did* finally decide to talk to law enforcement officers about the killing of Halley, Cupit told them he had never gone back to the crime scene—yet, as noted, an eyewitness testified to seeing Mann and Cupit driving near the crime scene on the day the body was found.

The fact that Cupit denied that he killed Halley, and further denied he had intended to participate in, or aid and abet in Halley's murder, is certainly not devastating to the prosecution's case. Anyone standing accused of murder as Cupit was can be expected to say such things. And the jury was entitled to find Cupit's contentions of innocence lacking in credibility, given the substantial circumstantial evidence contravening such contentions—i.e., his actions. The rendering of such credibility determinations is precisely the thing juries are entrusted to do under our system of criminal justice.

In sum, the fact that the assumed hearsay evidence about which Cupit complains *may* have actually prejudiced Cupit by causing a jury to convict him when it would not otherwise have done so is just not enough to support Cupit's claim for habeas relief under the applicable *Brecht–Kotteakos* standard. Even assuming that the statements about which Cupit complains were wrongfully admitted hearsay under the law of Louisiana, and even assuming that this wrongfully admitted evidence violated Cupit's Sixth Amendment rights, we conclude that—under the applicable harmless error factors of consideration, *supra*—the record defies the harboring of grave doubts as to whether such constitutional trial error had a "substantial and injurious effect or influence in determining the jury's verdict" of Cupit's guilt.[31]

### C. *Regarding Cupit's Insufficient Evidence Contention in Particular*

■ As an additional, or more specific argument, Cupit maintains that the evidence at his trial was insufficient to allow the jury to find him guilty *beyond a reasonable doubt* of the second degree murder of Halley. In accordance with the controlling standards set forth in the Supreme Court decision in *Jackson v. Virginia,* the reviewing court confronted with such a claim must, after reviewing all the evidence in the light most favorable to the conviction (prosecution), determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[32] As the magistrate and the district courts found, so do we: our de novo review of the record reveals, as we have addressed above, that there was ample evidence upon which the jury could have reasonably found Cupit guilty beyond a reasonable doubt of James Allen Halley's second degree murder—even without the assumed, improperly admitted hearsay evidence.

### III.  CONCLUSION

For the reasons stated above, the judgment of the district court is hereby VACATED; and the case is hereby REMANDED with directions to dismiss the petitioner's writ.

So Ordered.

---

**31.**  *Brecht, supra* note 14, —— U.S. at ——, 113 S.Ct. at 1714.

**32.**  *Jackson,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).